**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

MONA MOAZZAZ,                                              :
                                                          :        Civil Action No.:
                                          Plaintiff,       :
                                                          :
                          v.                              :        **COMPLAINT**
                                                          :
METLIFE, INC.; MICHEL KHALAF, in his                      :
individual and professional capacities; STEVEN            :        **Jury Trial Demanded**
KANDARIAN, in his individual and professional             :
capacities; FRANS HIJKOOP, in his individual and          :
professional capacities; SUSAN PODLOGAR, in               :
her individual and professional capacities; and           :
GARY HEDIGER, in his individual and                       :
professional capacities,                                  :
                                                          :
                                          Defendants.      :
------------------------------------------------------------X

Plaintiff Mona Moazzaz hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.       Plaintiff Mona Moazzaz joined Defendant MetLife, Inc. ("MetLife" or the
"Company") in February 2012.  She was unlawfully terminated in May 2019.

2.       Ms. Moazzaz, whose final position with the Company was Chief Administrative
Officer ("CAO"), was an outstanding performer throughout her seven-plus years at MetLife.

3.       Indeed, Ms. Moazzaz received the highest possible performance ratings virtually
every year and was consistently ranked in the top 5 to 10% when it came to the performance of
the Company's leaders.

4.       However, despite her outstanding performance Ms. Moazzaz was subjected to
repeated acts of discrimination and harassment by members of MetLife's top leadership team.

5.     This conduct included, *inter alia*, discriminatory pay practices, gender-based hostility, inappropriate discriminatory comments and everything between.

6.     By way of example only:

- Ms. Moazzaz was paid $525,000 less than a man even though she performed the same job along with many additional job responsibilities.  Additionally, Ms. Moazzaz was paid between $100,000 and $370,000 less than eight other different men even though she performed work that was equally or more complex and substantial.

- It is perhaps unsurprising that Ms. Moazzaz was subjected to discriminatory pay practices, as MetLife was given an "F" by Arjuna Capital with respect to its gender pay gap. See http://arjuna-capital.com/wp-content/uploads/2018/04/GenderPayScorecard.pdf.

- Defendant Gary Hediger, MetLife's Head of Human Resources for Global Technology and Operations, referred to Ms. Moazzaz as a ***"bitch."***  Although he admitted making this comment, and it was reported to Frans Hijkoop, MetLife's former Chief Human Resources Officer ("CHRO") no remedial action was taken.

- MetLife and Defendant Susan Podlogar, MetLife's current CHRO, declined Ms. Moazzaz's bid for promotion to an Executive Vice President ("EVP") role because Ms. Moazzaz was purportedly "too mean" and "shouts."  Ms. Podlogar said that she would only consider promotion for Ms. Moazzaz if she was "nicer."  These comments would never have been made about a successful man at MetLife.

- Mr. Bubb, the "leadership coach" assigned by MetLife to "fix" Ms. Moazzaz told her "if you want to be promoted, you need to choose between being pretty and being smart because men can't put you in both boxes."  Of course, a man would never be coached to choose between being handsome or intelligent.

- Mr. Bubb also told Ms. Moazzaz to "wear less makeup" and "dress conservatively."  This is apparently the advice that MetLife thought Ms. Moazzaz needed in order to become a better leader.

- Ms. Moazzaz was subjected to a number of other discriminatory pejorative comments throughout her employment, including being referred to by men as a "commander" and "the little one," as well as being accused by men of having "sharp elbows" and sending emails that were "too short." Meanwhile, men at MetLife are encouraged to be, and rewarded for being, aggressive.

7.      Ms. Moazzaz complained about the discriminatory treatment to which she was subjected, including in emails.  In addition, Martin Lippert, the Company's former Global Head of Technology & Operations, complained on Ms. Moazzaz's behalf.

8.      By way of example only, on November 19, 2017, Ms. Moazzaz complained to Mr. Lippert as follows:

> MetLife GTO has posted two SVP roles, one for Greg and one for Chris.  Strategy roles with very small teams.  I do not understand how it is remotely possible that with my scope and job responsibilities I am at a SVP level, particularly when the same group is reviewing my role and those roles? How is my job equal to these jobs?  This is incredibly unfair.
>
> We are now approaching four months of this regretful situation where the EG has a lack of urgency and care in dealing with their top female talent.  It is incredibly hard to ignore this stuff day to day and week to week with no one to talk to about it and with no approaching horizon of completion. We should be able to do so much better.  Multiple female associates have approached me over the past few months conveying how happy they are that I'm a woman at the front with the rest of the leadership team - they have no idea what I'm really going through and how the vision they're seeing isn't the reality they would hope for.

9.      Mr. Lippert reported Ms. Moazzaz's complaints to MetLife's then-Chief Executive Officer ("CEO"), Steven Kandarian.  Mr. Kandarian was advised that MetLife would be asking for a lawsuit if the situation was not resolved.  Mr. Kandarian took no remedial action.

10.     In February 2018, just three months after Ms. Moazzaz's email, Ms. Moazzaz learned that her bid for a promotion to EVP had been denied.

11.     Then, in late-2018, MetLife was in the process of determining who would succeed then-Chief Executive Officer ("CEO"), Defendant Steven Kandarian, as the Company's CEO. Ultimately, this CEO "race" came down to two applicants, Mr. Khalaf and Mr. Lippert.

12.     Ms. Moazzaz led Mr. Lippert's "campaign" for the CEO position.  In September 2018, as part of her role leading this campaign, Ms. Moazzaz authored a CEO candidate strategy. The document exposed many major gaps in diversity at MetLife (among many, many other issues).  By way of example, part of the CEO strategy reads, *inter alia*:

> Only a handful of African-, Latin- and Asian-American officers have been hired at MetLife in the last two years.  As well, at a time when nearly 50% of our customers are women, only 14% of our sales leaders are female.  Adding to this is that our discourse on the equality of humankind is nascent.

13.     After Mr. Kandarian received a copy of the candidate strategy, which highlighted gaps in diversity, poor capital market performance (18th out of 22 industry competitors), financial discipline and regulatory scrutiny surrounding multiple risk issues (resulting in charges of $331 million to $2 billion), among many other issues, he began to retaliate against Ms. Moazzaz.  During meetings, Mr. Kandarian literally would not speak to Ms. Moazzaz, nor would he acknowledge her in any way in the event they passed each other at the office.

14.     Then, on January 8, 2019, MetLife announced that Defendant Michel Khalaf would take over as the Company's CEO effective May 1, 2019.

15.     Mr. Khalaf also subjected Ms. Moazzaz and other women to discriminatory conduct.

16.     By way of example only, Mr. Khalaf would regularly bypass Ms. Moazzaz and reach out directly to members of her team, which of course undermined her position and authority.  In addition, in February 2019, Mr. Khalaf announced to the Company's leaders that

4

he would host a corporate strategy session.  Neither Ms. Moazzaz nor the other female leader on Mr. Lippert's team, the Global Head of Customer Service, were invited to this strategy session.

17.     Just eight business days after Mr. Khalaf took over as MetLife's CEO, Ms. Moazzaz was unceremoniously terminated without notice and escorted out of the building.

## NATURE OF THE CLAIMS

18.     Plaintiff seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices in violation of the Equal Pay Act, 29 U.S.C. §§ 206, *et seq*. ("EPA"), the New York State Human Rights Law, N.Y. Executive Law §§ 290, *et seq.* ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, *et seq.* ("NYCHRL") and the New York Equal Pay Law, New York Labor Law § 194 ("NYEPL").

## ADMINISTRATIVE PROCEDURES

19.     Following the commencement of this action, a copy of this Complaint will be served on both the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

20.     Defendants' conduct also violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII").  For these violations, Ms. Moazzaz will be filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and, following receipt of a Notice of Right to Sue from the EEOC, will seek leave to file an Amended Complaint to add claims under Title VII.

21.     Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

22.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the EPA. The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

23.     Venue is proper in this County pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

24.     Plaintiff Mona Moazzaz is a former employee of MetLife.  Ms. Moazzaz, at all relevant times herein, met the definition of an "employee" under all relevant statutes.

25.     Defendant MetLife, Inc. is a Delaware Corporation and its principal place of business is located at 200 Park Avenue, New York, New York 10166.

26.     Defendant Michel Khalaf is the CEO of MetLife.  Mr. Khalaf supervised and had authority over the terms and conditions of Ms. Moazzaz's employment and met the definition of an "employer" and/or an "aider and abettor" under all relevant statutes.

27.     Defendant Steven Kandarian is the former CEO of MetLife.  Mr. Kandarian supervised and had authority over the terms and conditions of Ms. Moazzaz's employment and met the definition of an "employer" and/or an "aider and abettor" under all relevant statutes.

28.     Defendant Frans Hijkoop is the former CHRO of MetLife.  At all relevant times, Mr. Hijkoop met the definition of an "aider and abettor" under all relevant statutes.

29.     Defendant Susan Podlogar is the current CHRO of MetLife.  At all relevant times, Ms. Podlogar met the definition of an "aider and abettor" under all relevant statutes.

30.     Defendant Gary Hediger is MetLife's Head of Human Resources for Global

Technology and Operations.  At all relevant times, Mr. Hediger met the definition of an "aider

and abettor" under all relevant statutes.

## FACTUAL ALLEGATIONS

### I.     MS. MOAZZAZ'S EMPLOYMENT AND PERFORMANCE AT METLIFE

31.     In February 2012, Ms. Moazzaz was hired by MetLife into a Vice President

("VP") role in the Company's Global Technology and Operations ("GTO") division.

32.     Prior to joining MetLife, Ms. Moazzaz worked at various prestigious companies,

including Accenture, Deloitte and Booz & Company (which was subsequently acquired by

PwC), before which she received her MBA from the Wharton School.

33.     Among other responsibilities and accomplishments, as a VP, Ms. Moazzaz

performed job responsibilities that were outside of her VP role.

34.     Specifically, she led the Company's reporting to Mr. Kandarian and the Board of

Directors with respect to governance and performance, including on areas relating to cyber

security and technology risk, customer service and operations.

35.     Ms. Moazzaz also designed and led the Company's $300 million dollar

Reinvestment Fund strategy.

36.     Ms. Moazzaz led the company's largest recruiting effort in MetLife's history,

including overseeing the establishment of its new technology hub in North Carolina.

37.     Ms. Moazzaz also managed the design and execution of the division's

communications strategy, which spanned over 20,000 associates.

38.     In September 2014, to account for her performing these incremental responsibilities, Ms. Moazzaz was promoted (only after she was forced to spend months fighting for the promotion) to a Senior Vice President ("SVP") role and the title of CAO.

39.     Between September 2014 and June 2017, in addition to her responsibilities as CAO, Ms. Moazzaz also served as MetLife's Interim Global Head of Digital Security ("GHDS").  As the GHDS, Ms. Moazzaz led over 200 full time employees and pioneered MetLife's first-ever global Digital strategy across all regions, divisions and corporate functions. Ms. Moazzaz also directed MetLife's multiyear digital investments spanning customer experience technologies, data analytics, distribution platforms and innovation, all while developing the Company's communications to the Board of Directors and to the Company's 50,000-plus employees.

40.     Finally, in addition to all the above, Ms. Moazzaz also was required to perform various Human Resources ("HR") functions because the CHROs who worked during Ms. Moazzaz's time at MetLife – Mr. Hijkoop and Ms. Podlogar – failed to adequately perform the responsibilities of their roles.

41.     From 2012 to 2014, Ms. Moazzaz designed the strategy for and managed the largest recruiting effort in the history of the Company (2000 roles).  This resulted in over $100mm in savings to the Company.

42.     In 2015, Ms. Moazzaz designed and managed the largest non-sales rewards program in MetLife's history.  This served over 22,000 associated in 43 countries.

43.     In 2016, she oversaw the design and launch of MetLife Technical University, including the design of the University's recruiting and development programs.  The University has served over 500 millennials / early in career associates.  In the same year, Ms. Moazzaz

designed an executive communications skills course for MetLife's officers (and rolled out this training to over 300 leaders across the Company).

44.     In 2017, Ms. Moazzaz designed the operating model and organizational structure for the Company's largest division.  She also managed diversity efforts to promote the increased inclusion and advancement of veterans and women.

45.     In July 2017, three corporate functions and departments were added to the scope of Ms. Moazzaz's role.  These global corporate functions, strategy and large-scaled corporate transformation efforts totaled roughly over $1 billion in spend.  This included, among many other responsibilities, the execution of the company's largest strategic transformation efforts, such as acquisitions and divestitures (including running the execution of the restructuring and spinoff of the Company's Retail business), the buildout of new global shared services hubs, the implementation of regulatory and compliance initiatives and the delivery of corporate cost savings targets.  As to the latter responsibility, Ms. Moazzaz helped to execute MetLife's $1 billion cost efficiency program.

46.     Ms. Moazzaz also oversaw and executed the most significant change to the Company's brand in three decades.

47.     In addition, Ms. Moazzaz was responsible for MetLife's global corporate security and global real estate, including oversight of a $400 million dollar P&L, and oversaw the end-to-end buildout of new MetLife worksites.  This included, inter alia, overseeing mass recruiting efforts for new office locations, the designing and building of new campuses and employee onboarding, as well as assisting with culture assimilation and the development of government and community partnerships.

48.     To say that Ms. Moazzaz's performance was outstanding would be an understatement.  Ms. Moazzaz received top performance ratings virtually every year she was at MetLife, and was consistently ranked in the top 5 to 10% when it came to the performance of the Company's leaders.

## II.     METLIFE PAYS MEN SUBSTANTIALLY MORE THAN WOMEN FOR LESS OR EQUAL WORK

49.     As described above, there is no question that the CAO role is substantial and complex.  Ms. Moazzaz sat at the top of an organization of 151 full time employees and 1,400 contractors.  She oversaw a total budget of $1.41 billion.  She also performed the GHDS role for years in addition to her other responsibilities.

50.     However, at MetLife, women, including Ms. Moazzaz, are unfortunately paid substantially less than men who perform less or equal work.  The following comparisons from 2017 are illustrative:

- Chief Digital Officer: Ms. Moazzaz spent nearly three years performing the GHDS role while, at the same time, performing her CAO role.  The Chief Digital Officer ("CDO") role was part of the GHDS role.  In 2017, MetLife hired Greg Baxter (a man) as the CDO and paid him $525,000 *more* than Ms. Moazzaz.

- Head of Operations: The CAO role is more substantial and complex than the Head of Operations ("HO") role.  Nevertheless, Chris Smith, a man who performed the HO role, was paid more than $260,000 *more* than Ms. Moazzaz.

- Head of Asia IT: The CAO role is significantly more substantial and complex than the Head of Asia IT ("HOAIT") role.  Nevertheless, Steve Weinreb, a man who performed the HOAIT role, was paid approximately $200,000 *more* than Ms. Moazzaz.

- Head of Japan Operations: The CAO role is significantly more substantial and complex than the Head of Asia Operations ("HOAO") role.   Nevertheless, Toby Brown, a man who performed the HOAO role, was paid more than $200,000 *more* than Ms. Moazzaz.

- Head of M&A: The CAO role is more substantial and complex than the Head of M&A ("HM&A") role. Nevertheless, Adam Hodes, a man who performed the HM&A role, was paid more than $370,000 *more* than Ms. Moazzaz.

- EMEA Chief Financial Officer: The CAO role is significantly more substantial and complex than the EMEA Chief Financial Officer ("EMEA CFO") role. Nevertheless, Ed Spehar, a man who performed the EMEA CFO role, was paid more than $110,000 *more* than Ms. Moazzaz.

- U.S. Marketing Head: The CAO role is significantly more substantial and complex than the U.S. Marketing Head ("USMH") role. Nevertheless, Hugh Dineen, a man who performed the USMH role, was paid more than $105,000 *more* than Ms. Moazzaz.

- Head of Investor Relations: The CAO role is more substantial and complex than the Head of Investor Relations ("HIR") role. Nevertheless, John Hall, a man who performed the HIR role, was paid more than $130,000 *more* than Ms. Moazzaz.

- Head of Compliance: The CAO role is more substantial and complex than the Head of Compliance ("HOC") role. Nevertheless, Doug Rayvid, a man who performed the HOC role, was paid nearly $300,000 *more* than Ms. Moazzaz.

51.     In addition to these examples, MetLife was given an "F" by Arjuna Capital with respect to its gender pay gap. See http://arjuna-capital.com/wp-content/uploads/2018/04/GenderPayScorecard.pdf.

## III.   MS. MOAZZAZ IS SUBJECTED TO SYSTEMIC GENDER DISCRIMINATION AT METLIFE

52.     Unfortunately, pay was not the only area in which Ms. Moazzaz was discriminated against while working for MetLife. This Complaint is not intended to list all of the discriminatory treatment to which Ms. Moazzaz was subjected, but rather provides only some of the most blatant examples.

53.     In 2014, Ms. Moazzaz learned that Mr. Hediger had called her a "bitch" and a "commander."  Both terms are blatantly discriminatory and gender biased.  The former requires no explanation.  The term "commander" is similar to criticizing a woman for being "too aggressive" in the workplace.

54.     Of course, men are routinely aggressive in the workplace and are praised and rewarded for such conduct.  However, when women are perceived to have acted aggressively, it is often the case that they receive discriminatory backlash and are "put in their place."  Indeed, as explained by Justice William J. Brennan, Jr. in an opinion written in the case of Price Waterhouse v. Hopkins, 490 U.S. 228 (1989):

> An employer who objects to aggressiveness in women but whose positions require this trait puts women in an intolerable and impermissible Catch 22: out of a job if they behave aggressively and out of a job if they do not.  [The anti-discrimination laws] lift[] women out of this bind.

55.     Ms. Moazzaz reported Mr. Hediger's comments to Mr. Lippert.  The comment also was reported, by Mr. Lippert, to Mr. Hijkoop, who was the CHRO at the time.

56.     Despite the fact that Mr. Hediger admitted to the comments, he was not disciplined or reprimanded in any way.

57.     The comment also was reported, by Mr. Lippert, to Ms. Podlogar when she took over the CHRO role.  Although Ms. Podlogar had an obligation to report this incident to the Board, upon information and belief, she never did so, nor did she discipline Mr. Hediger.

58.     In 2015, Ms. Moazzaz was the target of additional discriminatory comments.

59.     On one occasion Mr. Hijkoop called Ms. Moazzaz into his office for the sole purpose of telling her that she needed to "be nicer."

60.     He followed up this comment by telling Ms. Moazzaz that she needed to "be more like the woman that he had researched on the internet [referring to internet research he conducted on Ms. Moazzaz] that participates in community service activities and supports not-for-profit organizations."

61.     Mr. Hijkoop also stated – during a c-suite talent meeting review – that Ms. Moazzaz has "sharp elbows."  The same comment also was made in 2017 by Christopher Townsend, MetLife's former Head of Asia.  All of these comments are discriminatory and never would have been made to or about a man.

62.     On July 31, 2017, three new departments were added to the scope of Ms. Moazzaz's role.  She received no additional pay for taking on these additional responsibilities.

63.     At around the same time, Ms. Moazzaz was told that she was being considered for a promotion to an EVP  role.  On November 19, 2017, Ms. Moazzaz complained to Mr. Lippert in an email about the fact that she had not been promoted and was paid less than similarly-situated men:

> MetLife GTO has posted two SVP roles, one for Greg and one for Chris.  Strategy roles with very small teams.  I do not understand how it is remotely possible that with my scope and job responsibilities I am at a SVP level, particularly when the same group is reviewing my role and those roles? How is my job equal to these jobs?  This is incredibly unfair.
>
> We are now approaching four months of this regretful situation where the EG has a lack of urgency and care in dealing with their top female talent.  It is incredibly hard to ignore this stuff day to day and week to week with no one to talk to about it and with no approaching horizon of completion. We should be able to do so much better.  Multiple female associates have approached me over the past few months conveying how happy they are that I'm a woman at the front with the rest of the leadership team - they have no idea what I'm really going through and how the vision they're seeing isn't the reality they would hope for.

64.     Just three months later, in February 2018, Ms. Moazzaz was told by Mr. Lippert that Ms. Podlogar had denied Ms. Moazzaz's promotion to the EVP role.

65.     Ms. Podlogar's stated reason for the decision not to promote Ms. Moazzaz was that she was purportedly "too mean, condescending and shouts."

66.     Ms. Podlogar told Mr. Lippert that if Ms. Moazzaz "is nicer, I will reconsider the promotion next year."

67.     For the same discriminatory reasons, Ms. Podlogar initiated an investigation into Ms. Moazzaz and lowered her performance rating by overriding her manager's recommended rating.  The latter action resulted in a reduced bonus.

68.     Ms. Podlogar also directed Ms. Moazzaz to undergo six months of leadership training.

69.     All of this shameful discriminatory and retaliatory conduct was reported directly to Mr. Kandarian by Mr. Lippert.  Mr. Kandarian was advised that MetLife would be asking for a lawsuit if the situation was not resolved.  Mr. Kandarian took no remedial action.

70.     MetLife subsequently hired leadership coach Howard Bubb, from Merrick & Company, to work with Ms. Moazzaz.

71.     As part of the coaching process, several leaders at MetLife were interviewed in-person about Ms. Moazzaz and over 20 additional people were asked to fill out a survey regarding Ms. Moazzaz.  This, of course, was humiliating and extremely damaging to Ms. Moazzaz's reputation.

72.     During one of Mr. Bubb's "coaching" sessions, he told Ms. Moazzaz, "if you want to be promoted, you need to choose between being pretty and being smart because men

can't put you in both boxes."  Of course, a man would never be coached to choose between being handsome or intelligent.

73.     Mr. Bubb also told Ms. Moazzaz to "wear less makeup" and "dress conservatively."  This is apparently the advice that MetLife thought Ms. Moazzaz somehow needed in order to become a better leader.

74.     In the middle of all of this, in 2018, Mr. Hediger, whom MetLife allowed to act in a discriminatory manner without rebuke, began referring to Ms. Moazzaz (in conversations with senior leaders) as the "little one."  Obviously, no man ever would have been referred to in this way.

75.     Referring to a woman by something other than her name is a common way that men in the workplace diminish, marginalize and belittle women.

76.     Mr. Hediger, as usual, suffered no consequences for his discriminatory conduct.

## IV.    MS. MOAZZAZ ENGAGES IN ADDITIONAL PROTECTED ACTIVITY AND IS RETALIATED AGAINST

77.     In June 2018, purportedly because a male subordinate, Tim O'Brien, complained that Ms. Moazzaz did not trust him, Employee Relations opened a second and duplicative investigation into Ms. Moazzaz.

78.     In connection with the investigation, Ms. Moazzaz was interviewed by Tracey Tate-Gowins, an Employee Relations Lead.  The meeting was held on June 19, 2018 and was attended by Ms. Tate-Gowins and Ms. Moazzaz, as well as another colleague who worked in HR.

79.     After Ms. Moazzaz was confronted with Mr. O'Brien's purported complaint, the other HR colleague who attended the meeting told Ms. Tate-Gowins that Mr. O'Brien had serious performance issues, that his team was in complete disarray and that she (the colleague)

was not convinced of his abilities.  Ms. Moazzaz noted that Mr. O'Brien continually attempted to lay off very high-performing African Americans on his team without justification, despite the fact that MetLife had (and has) tremendous diversity issues with respect to African American hiring.

80.     When Ms. Moazzaz asked for examples of any inappropriate conduct towards Mr. O'Brien, Ms. Tate-Gowins told her that Mr. O'Brien had issues with Ms. Moazzaz's "tone" and that her emails were "too short."

81.     Ms. Moazzaz responded to this discriminatory critique by explaining that the word "tone" is a term that is used to treat women differently than men.

82.     She also said that MetLife perpetuated a culture in which women are discriminatorily critiqued for being "too tough" or having "sharp elbows."

83.     Ms. Moazzaz also complained about the fact that a Head of HR (Mr. Hediger) had referred to her as a "bitch," a "commander" and "the little one."

84.     Ms. Moazzaz told Ms. Tate-Gowins that focusing on gender-based critiques like "tone" only perpetuates a culture that supports the poor treatment of women in the workplace.

85.     She also told Ms. Tate-Gowins that a man at MetLife would never have been asked to ensure that he sent lengthier emails.

86.     Ms. Tate-Gowins purportedly agreed that Mr. O'Brien had performance issues and that he needed additional leadership development.  However, Ms. Tate-Gowins never followed up on this (despite the fact that MetLife was forcing Ms. Moazzaz to work with a leadership coach at that very moment).  Instead, the only follow up Ms. Moazzaz received was an email from Ms. Tate-Gowins in which she told Ms. Moazzaz that her complaints about discriminatory conduct were "surprising."

87.     It bears noting that in November 2018, Ms. Podlogar hired LinkedIn to run an employee engagement survey that sought feedback from employees with respect to managers at MetLife.  ***Ms. Moazzaz received the highest score of all of the members of the divisional leadership team.***  She also outperformed the Company's average score as well as the industry's average score.  Ms. Moazzaz had also received a positive report from Mr. Bubb, her leadership coach.  Thus, objective data and reviews completely undermine the discriminatory and retaliatory rationale for the decision not to promote Ms. Moazzaz and subject her to harassing discriminatory comments and disparate pay.

88.     Then, in December 2018, MetLife's former Global Chief Diversity and Inclusion Officer, Elizabeth Nieto, told Ms. Moazzaz that certain men in senior leadership were "uncomfortable" with a mural that Ms. Moazzaz had installed on the wall to support women's advancement at MetLife.

89.     Specifically, the mural stated:

ADVANCING WOMEN: Humankind is a bird with two wings;
One is women, the other is men.  Only when both wings are
equal can we soar.

90.     The mural was promoting equality, and even referenced men, but male senior leaders apparently felt "excluded" by the mural.

91.     Ms. Nieto wrote an email in which she relayed critical feedback about the mural based on, inter alia, the fact that it was placed in common space "for all genders and not solely women" and could somehow diminish other areas of diversity.

92.     Ms. Nieto also said that the "fancy bird" in the mural was "too feminine."

93.     This outrageous response to a simple showing of support for women is illustrative of the fact that men at MetLife are not welcoming of, nor do they want, equality for women at the Company.

## V.     MS. MOAZZAZ ENGAGES IN PROTECTED ACTIVITY IN CONNECTION WITH THE CEO RACE AND SUFFERS RETALIATION YET AGAIN

94.     In late 2018, Ms. Moazzaz authored a "CEO candidate strategy" in connection with MetLife's decision as to who would succeed Mr. Kandarian as the Company's CEO.

95.     Ultimately, this CEO "race" came down to two applicants, Mr. Khalaf and Mr. Lippert.  Ms. Moazzaz led Mr. Lippert's "campaign" for the CEO position.

96.     In September 2018, as part of her role leading this campaign, Ms. Moazzaz authored the CEO candidate strategy.  The document exposed many major gaps in diversity at MetLife (among many, many other issues).

97.     By way of example, part of the CEO strategy reads:

> Only a handful of African-, Latin- and Asian-American officers have been hired at MetLife in the last two years.  As well, at a time when nearly 50% of our customers are women, only 14% of our sales leaders are female.  Adding to this is that our discourse on the equality of humankind is nascent – largely raised as an agenda item by minorities.  Going forward, we will bring the majority and minority together as collaborators to help solve this issue.  We will revamp our diversity recruitment and retention strategy towards the objective of building a fundamental, not superficial, solution.

98.     After this CEO candidate strategy was authored, and before the CEO decision was made, the Lead Director of the Board of MetLife (who is now the Chair) had a copy of it hand-couriered to Mr. Kandarian (despite telling Mr. Lippert that Mr. Kandarian would not be provided with a copy).

99.     After receiving a copy of the candidate strategy, which highlighted gaps in diversity, poor capital market performance (18th out of 22 industry competitors), financial discipline and regulatory scrutiny surrounding multiple risk issues (resulting in charges of $331 million to $2 billion), among many other issues, Mr. Kandarian began to retaliate against Ms. Moazzaz.

100.    During meetings, Mr. Kandarian literally would not speak to Ms. Moazzaz, nor would he acknowledge her in any way in the event they passed each other at the office.

101.    On January 8, 2019, MetLife announced that Mr. Khalaf would take over as the Company's CEO effective May 1, 2019.

102.    Mr. Khalaf also subjected Ms. Moazzaz and other women to discriminatory conduct.

103.    By way of example only, Mr. Khalaf would regularly bypass Ms. Moazzaz and reach out directly to members of her team, which of course undermined her position and authority.

104.    In addition, in February 2019, Mr. Khalaf announced to the Company's leaders that he would host a corporate strategy session.  Neither Ms. Moazzaz nor the other female leader on Mr. Lippert's team, the Global Head of Customer Service, were invited to this strategy session.

## VI.    MS. MOAZZAZ IS TERMINATED BECAUSE SHE IS A WOMAN AND ENGAGED IN PROTECTED ACTIVITY

105.    Just eight business days after Mr. Khalaf assumed his role as CEO, Ms. Moazzaz was unceremoniously terminated without notice.  The news was conveyed to Ms. Moazzaz by Jill Cancelosi, a VP in HR.

106.     Upon being told that she was terminated, Ms. Cancelosi immediately escorted Ms. Moazzaz out of the building.

107.     Then, without consulting Ms. Moazzaz at all, MetLife took it upon itself to send out an email falsely telling employees that she was "leaving MetLife to pursue external opportunities."  This did tremendous damage to Ms. Moazzaz's reputation, as it appeared as though she had simply voluntarily left the Company with no notice to anyone and without saying goodbye.

108.     To help mitigate the damage to her reputation, Ms. Moazzaz asked to have an "out of office" message set up on her MetLife email, and for employee farewell emails to be forwarded to her.  Ms. Cancelosi gratuitously denied these requests.

109.     By way of comparison, Mr. Kandarian's Chief of Staff was a man named Michael Zarcone.  When Mr. Khalaf took over, Mr. Zarcone lost his Chief of Staff role.  However, he was not terminated.  Instead, to ensure that Mr. Zarcone had enough work to do, Ms. Moazzaz's real estate responsibilities were handed over to Mr. Zarcone.  To add insult to injury, Mr. Zarcone was an EVP and kept this title when he took over Ms. Moazzaz's real estate responsibilities.  In contrast, although real estate only made up a portion of Ms. Moazzaz's responsibilities, Ms. Moazzaz was denied a promotion to the EVP level.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Discrimination in Violation of the Equal Pay Act)**
***Against MetLife, Mr. Khalaf, Mr. Kandarian and Ms. Podlogar***

110.     Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

111.     By the conduct described herein, MetLife, Mr. Khalaf, Mr. Kandarian and Ms. Podlogar required Plaintiff to perform the same or substantially the same job position as male

employees, requiring equal skill, effort and responsibility under similar working conditions at the same establishment, and paid Plaintiff at a rate of pay, including salary and bonus, less than such male employees.  The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a factor other than gender.

112.     MetLife, Mr. Khalaf, Mr. Kandarian and Ms. Podlogar engaged in patterns, practices and/or policies of employment which willfully discriminated against Plaintiff on the basis of her gender and by paying Plaintiff a lesser rate of pay, including salary and bonus, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions and at the same establishments.

113.     By the actions described above, among others, MetLife, Mr. Khalaf, Mr. Kandarian and Ms. Podlogar have violated the Equal Pay Act, 29 U.S.C. § 206 *et seq.*

114.     As a direct and proximate result of MetLife's, Mr. Khalaf's, Mr. Kandarian's and Ms. Podlogar's unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

115.     Plaintiff is further entitled to liquidated damages, reasonable costs and attorneys' fees.

<u>**AS AND FOR A SECOND CAUSE OF ACTION**</u>
**(Gender Discrimination in Violation of the NYSHRL)**
***Against All Defendants***

116.     Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

117.    MetLife, Mr. Khalaf and Mr. Kandarian have discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by subjecting Plaintiff to disparate treatment based upon her gender, including, *inter alia*, discriminatory pay, failures to promote, termination and/or a hostile work environment.  Mr. Khalaf, Mr. Kandarian, Mr. Hijkoop, Ms. Podlogar and Mr. Hediger aided and abetted the unlawful discrimination.

118.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and aiding and abetting of same in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

119.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and aiding and abetting of same in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
#### *Against All Defendants*

120.    Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

121.    MetLife, Mr. Khalaf and Mr. Kandarian have retaliated against Plaintiff on the basis of her protected activity in violation of the NYSHRL by subjecting Plaintiff to adverse actions because she engaged in protected activity, including, *inter alia*, failures to promote and/or termination.  Mr. Khalaf, Mr. Kandarian, Mr. Hijkoop, Ms. Podlogar and Mr. Hediger aided and abetted the unlawful retaliation.

122.     As a direct and proximate result of Defendants' unlawful retaliatory conduct and aiding and abetting of same in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

123.     As a direct and proximate result of Defendants' unlawful retaliatory conduct and aiding and abetting of same in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

### AS AND FOR A FOURTH CAUSE OF ACTION
**(Gender Discrimination in Violation of the NYCHRL)**
***Against All Defendants***

124.     Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

125.     MetLife, Mr. Khalaf and Mr. Kandarian have discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by subjecting Plaintiff to disparate treatment based upon her gender, including, *inter alia*, discriminatory pay, failures to promote, termination and/or a hostile work environment.  Mr. Khalaf, Mr. Kandarian, Mr. Hijkoop, Ms. Podlogar and Mr. Hediger aided and abetted the unlawful discrimination.

126.     As a direct and proximate result of Defendants' unlawful discriminatory conduct and aiding and abetting of same in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

127.     As a direct and proximate result of Defendants' unlawful discriminatory conduct and aiding and abetting of same in violation of the NYCHRL, Plaintiff has suffered, and

continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

128.     Defendants' unlawful discriminatory conduct and aiding and abetting of same were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

### AS AND FOR A FIFTH CAUSE OF ACTION
**(Retaliation in Violation of the NYSHRL)**
***Against All Defendants***

129.     Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

130.     MetLife, Mr. Khalaf and Mr. Kandarian have retaliated against Plaintiff on the basis of her protected activity in violation of the NYCHRL by subjecting Plaintiff to adverse actions because she engaged in protected activity, including, *inter alia*, failures to promote and/or termination.  Mr. Khalaf, Mr. Kandarian, Mr. Hijkoop, Ms. Podlogar and Mr. Hediger aided and abetted the unlawful retaliation.

131.     As a direct and proximate result of Defendants' unlawful retaliatory conduct and aiding and abetting of same in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

132.     As a direct and proximate result of Defendants' unlawful retaliatory conduct and aiding and abetting of same in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

133.     Defendants' unlawful retaliatory conduct and aiding and abetting of same were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

### AS AND FOR A SIXTH CAUSE OF ACTION
**(Discrimination in Violation of the New York Equal Pay Act)**
***Against MetLife, Mr. Khalaf, Mr. Kandarian and Ms. Podlogar***

134.     Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

135.     By the conduct described herein, MetLife, Mr. Khalaf, Mr. Kandarian and Ms. Podlogar required Plaintiff to perform the same or substantially the same job position as male employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff at a rate of pay, including salary and bonus, less than such male employees.  The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a factor other than gender.

136.     MetLife, Mr. Khalaf, Mr. Kandarian and Ms. Podlogar engaged in patterns, practices and/or policies of employment which willfully discriminated against Plaintiff on the basis of her gender and by paying Plaintiff a lesser rate of pay, including salary and bonus, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions and at the same establishments.

137.     By the actions described above, among others, MetLife, Mr. Khalaf, Mr. Kandarian and Ms. Podlogar have violated the NYEPL.

138.    As a direct and proximate result of MetLife's, Mr. Khalaf's, Mr. Kandarian's and Ms. Podlogar's unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

139.    Plaintiff is further entitled to liquidated damages, reasonable costs and attorneys' fees.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.    An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.    An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment;

D.    An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

E.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income, earned bonus pay, reputational harm and harm to professional reputation, in an amount to be determined at trial;

F.      An award of punitive damages and any applicable penalties and/or liquidated damages, in an amount to be determined at trial;

G.      Prejudgment interest on all amounts due;

H.      An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: November 13, 2019
        New York, New York                            Respectfully submitted,

                                                       **WIGDOR LLP**

                                                       By: _____

                                                           Douglas H. Wigdor
                                                           Michael J. Willemin
                                                           Taylor J. Crabill

                                                       85 Fifth Avenue
                                                       New York, NY 10003
                                                       Telephone:  (212) 257-6800
                                                       Facsimile:   (212) 257-6845
                                                       dwigdor@wigdorlaw.com
                                                       mwillemin@wigdorlaw.com
                                                       tcrabill@wigdorlaw.com

                                                       *Attorneys for Plaintiff*

27