**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
MONA MOAZZAZ,                                        :
                                                                      :
                                        Plaintiff,           :          Civil Action No.: 19-cv-10531 (JPO)
                                                                      :
            v.                                                    :
                                                                      :
METLIFE, INC.; MICHEL KHALAF, in his      :
individual and professional capacities; STEVEN  :
KANDARIAN, in his individual and professional  :
capacities; FRANS HIJKOOP, in his individual and  :
professional capacities; SUSAN PODLOGAR, in  :
her individual and professional capacities; and  :
GARY HEDIGER, in his individual and          :
professional capacities,                                :
                                                                      :
                                        Defendants.        :
-------------------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**


**WIGDOR LLP**

Douglas H. Wigdor
Michael J. Willemin
Taylor J. Crabill

85 Fifth Avenue
New York, NY 10003
Telephone:  (212) 257-6800
Facsimile:   (212) 257-6845

*Attorneys for Plaintiff*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 2

ARGUMENT ......................................................................................................................... 6

I.  LEGAL STANDARD ................................................................................................ 6

II.  THE AC PLEADS AN EPA CLAIM ....................................................................... 7

III.  THE AC PLEADS DISCRIMINATION CLAIMS .................................................. 10

  A.  Legal Standard ............................................................................................... 10

  B.  Plaintiff is Entitled to Rely on Evidence Outside the Limitations Period ............ 11

  C.  The AC States a Hostile Work Environment Claim ...................................... 11

  D.  The AC Alleges a Discriminatory Pay Claim ............................................... 16

  E.  The AC Alleges that Plaintiff's Termination was Discriminatory ................ 17

  F.  The AC Alleges a Discriminatory Failure to Promote Claim ....................... 18

IV.  THE AC SETS FORTH A RETALIATION CLAIM ................................................ 19

  A.  Legal Standard ............................................................................................... 19

  B.  The AC Pleads Claims for Retaliation Under the NYSHRL and NYCHRL ......... 20

V.  THE AC STATES A CLAIM AGAINST THE INDIVIDUAL DEFENDANTS ............ 24

CONCLUSION ...................................................................................................................... 26

i

## <u>TABLE OF AUTHORITIES</u>

<u>**Cases**</u>

<u>Abdu-Brisson v. Delta Air Lines, Inc.</u>,
 239 F.3d 456 (2d Cir. 2001)................................................................................. 17, 21

<u>Alexander v. Marriott Int'l, Inc.</u>,
 No. 09 Civ. 2402 (RWT), 2011 WL 1231029 (D. Md. Mar. 29, 2011) ................................... 10

<u>Alfano v. Costello</u>,
 294 F.3d 365 (2d Cir. 2002)....................................................................................... 15

<u>Alvarado v. Nordstrom, Inc.</u>,
 685 F. App'x 4 (2d Cir. 2017) .................................................................................... 14

<u>Barrett v. Forest Labs., Inc.</u>,
 39 F. Supp. 3d 407 (S.D.N.Y. 2014)............................................................................. 9

<u>Behringer v. Lavelle Sch. for Blind</u>, 08 Civ. 4899 (JGK),
 2010 WL 5158644 (S.D.N.Y. Dec. 17, 2010) ................................................................. 21

<u>Bell Atlantic Corp. v. Twombly</u>,
 550 U.S. 544 (2007)................................................................................................. 6

<u>Brands-Kousaros v. Banco Di Napoli S.P.A.</u>,
 No. 97 Civ. 1673 (DLC), 1997 WL 790748 (S.D.N.Y. Dec. 23, 1997)................................... 10

<u>Carter v. Verizon</u>,
 No. 13 Civ. 7579 (KPF), 2015 WL 247344 (S.D.N.Y. Jan. 20, 2015)..................................... 14

<u>Creacy v. BCBG Max Azria Grp., LLC</u>,
 No. 14 Civ. 10008 (ER), 2017 WL 1216580 (S.D.N.Y. Mar. 31, 2017).................................. 12

<u>E.E.O.C. v. Suffolk Laundry Servs., Inc.</u>,
 48 F. Supp. 3d 497 (E.D.N.Y. 2014) ............................................................................ 24

<u>Fenner v. News Corp.</u>,
 No. 09 Civ. 09832 (LGS), 2013 WL 6244156 (S.D.N.Y. Dec. 2, 2013) ................................. 22

<u>Fitzgerald v. Henderson</u>,
 251 F.3d 345 (2d Cir. 2001)....................................................................................... 11

<u>Garcia v. Coll. of Staten Is.</u>, 11 Civ. 2252 (KAM)(LB),
 2012 WL 3930448 (E.D.N.Y. July 31, 2012) .................................................................. 21

Germain v. Cty. of Suffolk,
    No. 07 Civ. 2523 (ADS)(ARL), 2009 WL 1514513 (E.D.N.Y. May 29, 2009) ..................... 19

Gilford v. N.Y.S. Office of Mental Health,
    No. 17 Civ. 8033 (JPO), 2020 WL 1529359 (S.D.N.Y. Mar. 31, 2020) ................................ 22

Glaski v. State of Conn., Dep't of Admin. Servs.,
    No. 86 Civ. 929 (JAC), 1991 WL 498669 (D. Conn. May 9, 1991) ...................................... 17

Glunt v. GES Exposition Servs., Inc.,
    123 F. Supp. 2d 847 (D. Md. 2000) ......................................................................................... 9

Grant v. Bethlehem Steel,
    622 F.2d 43 (2d Cir. 1980)...................................................................................................... 20

Guzman v. News Corp.,
    No. 09 Civ. 09323(LGS), 2013 WL 5807058 (S.D.N.Y. Oct. 28, 2013) ............................... 20

Hagan v. City of N.Y.,
    39 F. Supp. 3d 481 (S.D.N.Y. 2014)....................................................................................... 13

Hardekopf v. Sid Wainer & Son,
    No. 02 Civ. 3251 (LAP), 2004 WL 2199502 (S.D.N.Y. Sept. 29, 2004)................................ 16

Hernandez v. Kaisman,
    103 A.D.3d 106 (1st Dep't 2012) ........................................................................................... 12

Hood v. Pfizer, Inc.,
    322 F. App'x 124 (3d Cir. 2009) ............................................................................................ 22

Husser v. New York City Dep't of Educ.,
    137 F. Supp. 3d 253 (E.D.N.Y. 2015) ..................................................................................... 9

Jamilik v. Yale Univ.,
    362 F. App'x 148 (2d Cir. 2009) .............................................................................................. 8

Kassman v. KPMG LLP,
    925 F. Supp. 2d 453 (S.D.N.Y. 2013)...................................................................................... 7

Kaytor v. Elec. Boat Corp.,
    609 F.3d 537 (2d Cir. 2010)..................................................................................................... 16

Koster v. Chase Manhattan Bank,
    609 F. Supp. 1191 (S.D.N.Y. 1985), the court granted ....................................................... 9, 10

Kunik v. New York City Dep't of Educ.,
    No. 15 Civ. 9512 (VSB), 2017 WL 4358764 (S.D.N.Y. Sept. 29, 2017)................................. 6

Lebowitz v. New York City Dep't of Educ.,
    407 F. Supp. 3d 158 (E.D.N.Y. 2017) ............................................................... 14, 15

Leibovitz v. New York City Transit Auth.,
    252 F.3d 179 (2d Cir. 2001)................................................................................. 14

Lenzi v. Systemax, Inc.,
    944 F.3d 97 (2d Cir. 2019)................................................................................... 16

Lewis v. Triborough Bridge & Tunnel Auth.,
    77 F. Supp. 2d 376 (S.D.N.Y. 1999)...................................................................... 24

Magnotti v. Crossroads Healthcare Mgmt. LLC,
    No. 14 Civ. 6679 (ILG)(RML), 2016 WL 3080801 (E.D.N.Y. May 27, 2016)...................... 24

Mahony v. KeySpan Corp.,
    No. 04 Civ. 554 (SJ), 2007 WL 805813 (E.D.N.Y. Mar. 12, 2007)........................................ 20

Mauze v. CBS Corp.,
    340 F. Supp. 3d 186 (E.D.N.Y. 2018) ..................................................................... 9

Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,
    715 F.3d 102 (2d Cir. 2013)................................................................................. 11

O'Rourke v. Nat'l Foreign Trade Council, Inc.,
    110 N.Y.S.3d 104 (1st Dep't 2019) ........................................................................ 23

Pajic v. CIGNA Corp.,
    No. 89 Civ. 2404, 1990 WL 127797 (E.D. Pa. Aug. 31, 1990)................................................ 10

Patane v. Clark,
    508 F.3d 106 (2d Cir. 2007)................................................................................. 14

Petterson v. State Univ. of New York at Stony Brook,
    No. 15 Civ. 1228 (DRH), 2019 WL 367840 (E.D.N.Y. Jan. 30, 2019) .................................. 13

Phillip v. Univ. of Rochester,
    316 F.3d 291 (2d Cir. 2003)................................................................................... 6

Phillips v. Manhattan & Bronx Surface Transit Operating Auth.,
    132 A.D.3d 149, (N.Y. App. Div. 2015) .................................................................. 12

Pilgrim v. McGraw-Hill Companies, Inc.,
　599 F. Supp. 2d 462 (S.D.N.Y. 2009)................................................................. 13

Port Auth. Police Asian Jade v. Port Auth.,
　681 F. Supp. 2d 456 (S.D.N.Y. 2010)................................................................. 11

Price Waterhouse v. Hopkins,
　490 U.S. 228 (1989)............................................................................... 15, 18

Pryor v. Jaffe & Asher, LLP,
　992 F. Supp. 2d 252 (S.D.N.Y. 2014)................................................................ 24

Quinby v. WestLB AG,
　No. 04 Civ. 7406 (WHP), 2007 WL 1153994 (S.D.N.Y. Apr. 19, 2007) ................... 15, 17, 19

Reeves v. Sanderson Plumbing Prod., Inc.,
　530 U.S. 133 (2000)................................................................................... 21

Rehwaldt v. Elec. Data Sys. Corp.,
　No. 95 Civ. 876, 1996 WL 947568 (W.D.N.Y. Mar. 28, 1996).............................. 10

Rifkinson v. CBS, Inc.,
　No. 94 Civ. 7985 (KTD)(JCF), 1997 WL 634514 (S.D.N.Y. Oct. 14, 1997) ................ 18

Rozenfeld v. Dept. of Design & Constr.,
　2012 WL 2872157 (E.D.N.Y. 2012)................................................................ 19

Shein v. New York City Dep't of Educ.,
　No. 15 Civ. 4236 (DLC), 2016 WL 676458 (S.D.N.Y. Feb. 18, 2016) ..................... 19

Summa v. Hofstra,
　708 F.3d 115 (2d Cir. 2013)....................................................................... 20

Vega v. Hempstead Union Free School Dist.,
　801 F.3d 72 (2d Cir. 2015).......................................................................... 11

Wallengren v. Samuel French, Inc.,
　39 F. Supp. 2d 343 (S.D.N.Y. 1999)................................................................ 21

Williams v. New York City Hous. Auth.,
　61 A.D.3d 62 (1st Dep't 2009) ..................................................................... 12

Zambrano-Lamhaouhi v. New York City Bd. of Educ.,
　866 F. Supp. 2d 147 (E.D.N.Y. 2011) ............................................................. 17

Zubulake v. UBS Warburg LLC.,
   382 F. Supp. 2d 536 (S.D.N.Y. 2005).................................................................................. 17, 18

**<u>Other Authorities</u>**

Fed. R. Civ. P. 8(a)(2)............................................................................................................... 6

Plaintiff submits this memorandum of law in opposition to the Motion to Dismiss her Amended Complaint ("AC") filed by MetLife, Inc. ("MetLife" or the "Company"), Michel Khalaf, Steven Kandarian, Frans Hijkoop, Susan Podlogar and Gary Hediger ("Defendants").

### PRELIMINARY STATEMENT

It is impossible to review the 35-page, 182-paragraph AC and determine that it somehow fails to satisfy the exceedingly liberal pleading standards applicable to employment discrimination cases.  Thus, in order to support their motion to dismiss, Defendants were forced to file a brief that: (i) ignores these liberal pleading standards; (ii) turns a blind eye to most of the allegations in the AC; and (iii) misinterprets the law in various areas.  When one views the <u>actual</u> allegations in light of the <u>actual</u> law under the <u>actual</u> pleading standards, it becomes clear that Defendants' motion must be denied.

To begin, Defendants claim that Ms. Moazzaz's disparate pay claims under the Equal Pay Act ("EPA"), New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") should be dismissed because the AC fails to identify any appropriate comparators.  Putting aside the fact that the Second Circuit has held that this type of argument is more appropriately reserved for trial, the AC actually identifies ***nine*** different men who performed substantially similar or less work than Ms. Moazzaz, but were paid substantially more than her.  One of these men, Greg Baxter, was paid over $500,000 more than Ms. Moazzaz for doing the exact same job that she had previously performed (and, when she did it, she also had other responsibilities).  Moreover, the Second Circuit has recently held that a disparate pay claim outside of the EPA context does not even require the plaintiff to identify a comparator.

Defendants then proceed to argue for the dismissal of every single additional aspect of Ms. Moazzaz's discrimination and retaliation claims.  In doing so, Defendants present arguments

that are easily refuted, including, by way of example, that the conduct alleged does not constitute

a hostile work environment (it does) and that there are no allegations of discriminatory or

retaliatory animus (there are).  In fact, the allegations are sufficient to establish all of the

hallmarks of discriminatory and retaliatory animus, including, *inter alia*: (i) myriad

discriminatory comments by decisionmakers, including comments that are effectively admissions

of discrimination; (ii) many acts of discrimination against other women; (iii) disparate treatment

(between men and women, as well as between individuals who have engaged in protected

activity and those who have not) in, among other areas, pay and promotions; (iv) temporal

proximity; and (v) the fact that Ms. Moazzaz will easily be able to establish the falsity of any

non-discriminatory justification proffered by Defendants for their unlawful conduct.

Finally, the individual Defendants seek to be dismissed based on their claim that the AC

does not allege their involvement in the unlawful conduct.  As described *infra* at pp. 5-6, 24-25,

this claim is simply false.  Each of the individual Defendants participated in the unlawful

conduct alleged, and each is therefore subject to liability under the NYSHRL and NYCHRL.

## STATEMENT OF FACTS[1]

Ms. Moazzaz had been working for MetLife for just over seven years when she was

summarily and unlawfully terminated in May 2019.  ¶1.  By all objective measures – including

the Company's reviews – Ms. Moazzaz's performance was outstanding.  ¶¶2-3, 48, 129.  Ms.

Moazzaz's performance was all the more impressive when taking into account the fact that she

worked in an environment permeated with gender discrimination.

---

[1]     The AC is 35 pages and 182 paragraphs long.  Of course, it would be impossible to repeat all of the relevant allegations herein, and, as such, the "Statement of the Facts" section provides only a high-level summary of the allegations.  Plaintiff hereby incorporates by reference all of the facts alleged in the AC, Dkt. No. 20, the paragraphs to which will be cited herein as "¶__."  Further detailed allegations are laid out throughout this brief.

To begin, Ms. Moazzaz suffered the effects of a hostile work environment in which she was subjected to a litany of blatantly discriminatory comments and stereotypical critiques. ¶¶88-90, 92-94, 96-99, 100-113, 115-127, 130-143, 148; see also infra at pp. 11-14. This conduct includes, but is not limited to: (i) being referred to as a "bitch," a "commander," "the little one" and "too mean"; (ii) being critiqued for her "sharp elbows"; (iii) being told to "be nicer" and "more like the woman . . . that participates in community service activities and supports not-for-profit organizations"; and (iv) being advised to "dress conservatively," "wear less makeup" and that "if [she] want[ed] to be promoted, [she] need[ed] to choose between being pretty and being smart because men can't put [her] in both boxes," among many other comments. Id.

The discriminatory attitudes displayed by Defendants, including the individual Defendants, further revealed themselves in a series of discriminatory actions taken against Ms. Moazzaz, including, inter alia: (i) unequal pay; (ii) a failure to promote; (iii) being subjected to bogus and humiliating investigations for over a year; (iv) having her bonus cut; and (v) termination. ¶¶49-84 (relating to unequal pay), ¶¶95-99 (relating to failure to promote), ¶¶100, 110, 119 (relating to investigations and reduced bonus), ¶¶141-148 (relating to termination); see also infra at pp. 5-19. With respect to Ms. Moazzaz's equal pay claim, she identified no fewer than nine men who were paid substantially more than her for equal or less work. ¶¶49-84. **One of these men, Mr. Baxter, was paid over $500,000 more than Ms. Moazzaz for doing the exact same job that she did** (and, to boot, when she did it, she also had other responsibilities). ¶¶6, 39, 52. Moreover, MetLife received an "F" with respect to its gender pay gap from an independent third party. ¶84. Ms. Moazzaz also is aware of at least five other women who have been subjected to gender discrimination by Defendants. ¶¶116-118.

Far from conclusory allegations of discriminatory intent, the AC pleads facts sufficient to establish such unlawful intent through multiple avenues, including, *inter alia*: (i) discriminatory comments; (ii) comments that constitute admissions of discrimination; (iii) other acts of discrimination; (iv) disparate treatment; and (v) the fact that Ms. Moazzaz will be able to establish that any non-discriminatory justification proffered by Defendants will be false.  ¶¶2-3, 6, 39, 49-84, 88-90, 92-94, 96-99, 100-112, 115-127, 129, 130-148; see also *infra* at pp. 5-19.

Ms. Moazzaz complained repeatedly about the discrimination to which she and other women were subjected at MetLife, including, *inter alia*, complaining about: (i) all of the discriminatory comments and conduct described above; (ii) the fact that she was discriminatorily denied a promotion; (iii) MetLife's discriminatory hiring practices; and (iv) the fact that MetLife perpetuates a culture that supports discrimination.  ¶¶88-90, 102, 124-127 (relating to comments), ¶96 (relating to the promotion), ¶¶121, 139 (relating to discriminatory hiring practices); ¶¶121, 123-128 (relating to a discriminatory culture); see also *infra* at pp. 20-23.

To be clear, Ms. Moazzaz's complaints relating to a lack of diversity were not, as Defendants falsely claim, merely observations or questions about diversity.  Rather, she made complaints concerning specific discriminatory hiring practices, including, *inter alia*, complaining that: (i) one particular manager repeatedly attempted to terminate African American employees without justification; (ii) it was unacceptable that MetLife had not hired an African American officer in more than two years; (iii) the Company prioritized the promotions of senior employees rather than more diverse junior employees; (iv) the Company failed to have a recruiting strategy aimed at increasing diversity; and (v) the Company failed to hire "African-, Latin- and Asian-Americans" and employ women in senior positions.  ¶¶121-128, 139.

4

As described in detail in the AC and, to a lesser degree of detail, herein, Ms. Moazzaz's complaints were met with blatant acts of retaliation, including, but not limited to: (i) a failure to promote; (ii) a negative performance review that directly resulted in a pay cut; (iii) humiliating investigations; (iv) six months of unnecessary and retaliatory "coaching"; (v) being ostracized and cut out of important events; and (vi) termination. ¶¶97, 100 (relating to the failure to promote, performance review and pay cut), ¶¶104-112, 119 (relating to investigations and coaching); ¶¶137-148 (relating to deteriorating relationships culminating in termination); see also infra at pp. 20-23. The AC also pleads facts sufficient to establish all of the hallmarks of retaliatory animus, including, but not limited to: (i) temporal proximity; (ii) disparate treatment; and (iii) the fact that Ms. Moazzaz will be able to establish that any non-retaliatory justification proffered by Defendants will be false. Id.; see also ¶¶2-3, 48, 129.

Finally, the AC alleges in great detail how each of the individual Defendants named herein participated in the discrimination and retaliation at issue, or, at a minimum, condoned and/or acquiesced to the unlawful conduct.

- Defendant Khalaf: the AC alleges that he: (i) influenced Ms. Moazzaz's compensation (¶49); (ii) put his head in the sand with respect to discriminatory comments and conduct (¶102); and (iii) subjected Ms. Moazzaz to discriminatory disparate treatment and retaliatory conduct following his receipt of her protected complaints (¶¶145-147). In addition, most critically, Ms. Moazzaz was terminated just eight days after Defendant Khalaf became CEO, which certainly raises an inference that he was involved in the decision to terminate her (or made this decision). ¶148.

- Defendant Kandarian: the AC alleges myriad ways in which he engaged in, condoned and acquiesced to unlawful conduct, including: (i) setting Ms. Moazzaz's discriminatory compensation (¶49); (ii) failing to take remedial action in response to Ms. Moazzaz's protected complaints (¶¶102-103); and (iii) affirmatively retaliating against Ms. Moazzaz by refusing to speak with or acknowledge her (¶¶142-143).

- Defendants Hijkoop, Podlogar and Hediger also are alleged to have set Ms. Moazzaz's discriminatory compensation. ¶49. All three also are alleged to have contributed to the hostile work environment. ¶¶ 88-90, 92-94, 96-99, 100-112, 115-127, 130-143, 148. Defendants Hijkoop and Podlogar acquiesced to discrimination by failing to take remedial actions in response to Ms. Moazzaz's complaints. ¶¶88, 90, 118. Defendant Podlogar is further alleged to have been responsible for the discriminatory and retaliatory decision not to promote Ms. Moazzaz. ¶¶97, 100.

Simply put, the AC adequately pleads every cause of action, and Defendants' motion should be denied in its entirety.

## ARGUMENT

## I.   LEGAL STANDARD

FRCP 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." FRCP 8 does not require "detailed factual allegations," but only that the statements in the complaint make the claimed violation of law "plausible." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "These liberal pleading rules apply with particular stringency to complaints of civil rights violations." Phillip v. Univ. of Rochester, 316 F.3d 291, 293-94 (2d Cir. 2003) (citation omitted). Indeed, "an employment discrimination complaint 'must include only a short and plain statement of the claim that gives the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" Kunik v. New York City Dep't of Educ., No. 15 Civ. 9512 (VSB), 2017 WL 4358764, at *4 (S.D.N.Y. Sept. 29, 2017). "**Employment discrimination claims need not contain specific facts establishing a prima facie case of discrimination.**" Id. (emphasis added).

Defendants' motion: (i) ignores these liberal pleading standards; (ii) turns a blind eye to most of the allegations in the AC; and (iii) quite obviously misinterprets the law in various areas. When one views the actual allegations in light of the actual law under the actual pleading standards, it becomes clear that Defendants' motion must be denied.

## II.   **THE AC PLEADS AN EPA CLAIM**

The AC gives Defendants "fair notice" of the fact of, and basis for, Ms. Moazzaz's Equal Pay Act ("EPA") claim.  Indeed, Plaintiff has identified at least nine comparators who were paid more than her, including a man (Greg Baxter) who was paid over $500,000 more than her for performing the exact same duties.  ¶¶6, 39, 52.  Defendants' claim that Mr. Moazzaz did not allege that she and Mr. Baxter performed substantially similar work is incomprehensible.  The AC alleges: (i) that Mr. Moazzaz served as the Chief Digital Officer ("CDO") for three years; (ii) the responsibilities of the CDO role (¶39); (iii) that Ms. Moazzaz performed the "**same job [as Mr. Baxter] with many additional job responsibilities**" (¶6 (emphasis added)); and (iv) that, in comparison to Mr. Baxter, "Ms. Moazzaz was paid substantially less for equal (or more) work" (¶52).  These allegations are sufficient to allege an EPA violation.  See, e.g., Kassman v. KPMG LLP, 925 F. Supp. 2d 453, 471 (S.D.N.Y. 2013) (denying motion to dismiss EPA claim where the plaintiff identified a male comparator who "performed the same tasks as" the plaintiff).

In addition – and even though she is not required to do so – Ms. Moazzaz identified eight other men who were paid more than her despite performing substantially similar duties.  ¶¶53-82.  Defendants dismiss these comparisons by asserting that the AC alleges only that Ms. Moazzaz "had occasion to interact with the incumbents in these roles."  Def. Br. at pp. 8-9.  This is a gross misrepresentation.  The AC provides substantial detail about the overlap between the job duties of Ms. Moazzaz and her male comparators.  By way of example only:

- Ms. Moazzaz and Chris Smith, MetLife's Global Head of Operations, were responsible for reducing the Company's NIGO rate and improving its turnaround time for claims.  ¶¶53-54.

7

- Steve Weinrab, MetLife's Head of Asia IT, and Ms. Moazzaz were both responsible for the development of MetLife's technology in Asia.  ¶¶56-59.

- Toby Brown, the Head of Japan Operations, was, along with Ms. Moazzaz, responsible for improving the customer experience in Japan.  ¶¶60-62.

- Adam Hodes, the Head of M&A, and Ms. Moazzaz were both responsible for the Company's merger, acquisition and divesture efforts.  ¶¶64-66.

- Hugh Dineen, the Company's U.S. Marketing Head, and Ms. Moazzaz both worked on overseeing MetLife's efforts in marketing to customers in the United States, including on the "DeSnoopy" rebranding campaign.  ¶¶72-74.

- John Hall, MetLife's Head of Investor Relations, and Ms. Moazzaz were both responsible for presenting information about the Company's progress in key metrics to the investor and analyst communities.  ¶¶ 76-78.

- Doug Rayvid, the Head of Compliance, and Ms. Moazzaz both worked on managing risk and compliance for MetLife, including partnering with Ernst & Young to provide MetLife with assessments and recommendations concerning the Company's risk profile and strategy.  ¶¶80-82.

Even though Ms. Moazzaz and these male executives all performed similar functions, these men all made substantially more than she did, some in the order of hundreds of thousands of dollars more.  ¶¶55, 59, 63, 67, 71, 75, 79, 83.  The allegations are plainly sufficient to satisfy Ms. Moazzaz's light burden of giving Defendants fair notice of the basis for her EPA claim.  Yet, in the face of this detailed pleading, Defendants argue that Ms. Moazzaz somehow failed to plead facts to establish that the men identified in the AC are proper comparators.

First, while Defendants are free to make this argument at trial, the argument is premature at this stage.  Indeed, the Second Circuit has made clear "that questions regarding the equivalence of two positions pursuant to an EPA claim are best left to the trier of fact."  Jamilik

v. Yale Univ., 362 F. App'x 148, 150 (2d Cir. 2009) (collecting cases).  Second, Defendants'

argument boils down to a claim that Ms. Moazzaz cannot establish – as a matter of law and even

assuming the truth of her allegations – that the men identified in the AC are comparators because

she had *more* responsibility than these men.  This argument finds no support in the law.

The decision in Husser v. New York City Dep't of Educ., 137 F. Supp. 3d 253 (E.D.N.Y.

2015) is instructive.  In Husser, the plaintiff was the most senior employee in her division.  Id. at

260.  In support of her EPA claim, the plaintiff proffered eight other division heads who were

paid more.  Id. at 268-269.  The court denied the defendant's motion *for summary judgment*

despite "the substantive differences among each directors' duties and the wide array of their

departments' respective sizes and budgets."  Id. at 269.  Instead, the court focused on the fact

that the directors shared many of the same supervisors and had some similar responsibilities.  Id.

Similarly, in the instant case, Ms. Moazzaz alleged that she and her comparators had

similar (or identical) duties and reporting lines.  ¶¶54, 57, 65, 73.  Nothing more is required.  See

Barrett v. Forest Labs., Inc., 39 F. Supp. 3d 407, 434 (S.D.N.Y. 2014) (plaintiffs who identified

comparators whose "responsibilities were no greater" than their own stated an EPA claim); Glunt

v. GES Exposition Servs., Inc., 123 F. Supp. 2d 847, 861 (D. Md. 2000) (evidence that the

plaintiff was paid less than subordinates sufficient to sustain EPA claim).

The cases relied upon by Defendants, **many of which were decided on summary**

**judgment following a full discovery process**, do not support dismissal.  By way of example

only, in Mauze v. CBS Corp., 340 F. Supp. 3d 186 (E.D.N.Y. 2018), the court granted summary

judgment because the defendants "demonstrated that Mauze, a Manager, was not in fact paid less

than other Managers" and did not do as much work as Directors (who were senior to her).  Id. at

207.  Similarly, in Koster v. Chase Manhattan Bank, 609 F. Supp. 1191 (S.D.N.Y. 1985), the

9

court granted summary judgment based largely on an affidavit submitted by a comparator in which he affirmed that his duties were different than the plaintiff's. Id. at 1192. In contrast, in the instant case, the court is required to assume the truth of the allegations in the AC that Ms. Moazzaz was paid less for equal or greater work.[2]

Finally, Defendants argue that Ms. Moazzaz's EPA claims are deficient because some of the comparators she identified worked in different offices and, thus, worked in different "establishments." Defendants' argument is misplaced. Under the law, "an 'establishment' may consist of several locations operated by a single employer under a centralized management." Rehwaldt v. Elec. Data Sys. Corp., No. 95 Civ. 876, 1996 WL 947568 at *6 (W.D.N.Y. Mar. 28, 1996). Here, all of Ms. Moazzaz's comparators had common reporting lines or reported directly to Ms. Moazzaz. ¶¶53-82. Ms. Moazzaz is not pulling random employees from multiple locations to fabricate an EPA claim, and Defendants failed to cite any case that would indicate that dismissal is appropriate in light of the locations of the comparators identified.

## III.   THE AC PLEADS DISCRIMINATION CLAIMS

### A.   Legal Standard

To plead an NYSHRL disparate treatment claim, a plaintiff need only allege that (1) "the employer took [an] adverse action against [her]," and (2) her sex was "a motivating factor in the

---

[2]     The remainder of the case law cited by Defendants fares no better. In Alexander v. Marriott Int'l, Inc., No. 09 Civ. 2402 (RWT), 2011 WL 1231029 (D. Md. Mar. 29, 2011), the plaintiff compared herself to her direct supervisor. Id. at *4. In Brands-Kousaros v. Banco Di Napoli S.P.A., No. 97 Civ. 1673 (DLC), 1997 WL 790748 (S.D.N.Y. Dec. 23, 1997), the court dismissed the EPA claim because the plaintiff alleged that the defendant made pay decisions based on her national origin rather than her gender. Id. at *6. In Pajic v. CIGNA Corp., No. 89 Civ. 2404, 1990 WL 127797 (E.D. Pa. Aug. 31, 1990), a Pennsylvania court dismissed the plaintiff's complaint on the grounds that she did not establish the elements of her *prima facie* case under the EPA. Id. at *4. However, as explained *supra* at p. 6, the Second Circuit has held that a plaintiff is not required to plead a *prima facie* case.

employment decision." <u>Vega v. Hempstead Union Free School Dist.</u>, 801 F.3d 72, 87 (2d Cir. 2015).  Under the NYCHRL, "the plaintiff need only show differential treatment – that she is treated less well – because of a discriminatory intent." <u>Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.</u>, 715 F.3d 102, 110 (2d Cir. 2013).  Once this low threshold is met, the only way to avoid liability is for the employer to prove that "the conduct [alleged] amounted to no more than a petty slight." <u>Id.</u> at *111.  However, the *employer* bears the burden of proof on this affirmative defense, and it therefore cannot form the basis for a motion to dismiss. <u>See id.</u>

**B.      <u>Plaintiff is Entitled to Rely on Evidence Outside the Limitations Period</u>**

Initially, Defendants argue that events that occurred outside of the statute of limitations period cannot be used to support Ms. Moazzaz's claims.  In making this argument, Defendants conflate a procedural rule with an evidentiary one.  It is axiomatic that "[a] statute of limitations does not operate to bar the introduction of evidence that predates the commencement of the limitations period but that is relevant to events during the period." <u>Fitzgerald v. Henderson</u>, 251 F.3d 345, 365 (2d Cir. 2001).  Here, Defendants have tellingly not cited any support for their claim that the Court cannot consider events outside of the limitations period in assessing her allegations of gender discrimination and hostile work environment.  This is for the simple fact that courts in this circuit have recognized that it is "reversible error to preclude otherwise admissible evidence solely because it dated to a time when a claim would have been time-barred." <u>Port Auth. Police Asian Jade v. Port Auth.</u>, 681 F. Supp. 2d 456, 462 (S.D.N.Y. 2010).

**C.      <u>The AC States a Hostile Work Environment Claim</u>**

Under the NYSHRL, "a plaintiff must produce enough evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

working environment."  Creacy v. BCBG Max Azria Grp., LLC, No. 14 Civ. 10008 (ER), 2017

WL 1216580, at *6 (S.D.N.Y. Mar. 31, 2017) (citation and quotation omitted).  However, under

the NYCHRL, a plaintiff needs only allege that she was treated "less well" because of her

gender.  See, e.g., Williams v. New York City Hous. Auth., 61 A.D.3d 62, 78 (1st Dep't 2009);

see also Phillips v. Manhattan & Bronx Surface Transit Operating Auth., 132 A.D.3d 149, 156,

(N.Y. App. Div. 2015) ("the 'severe or pervasive' standard, which is used under federal and state

law to determine whether actionable harassment has occurred, does not apply to claims brought

under the NYCHRL.").  Even on summary judgment, claims under the NYCHRL can only be

dismissed in cases that are "truly insubstantial."  Hernandez v. Kaisman, 103 A.D.3d 106 (1st

Dep't 2012).

Here, the allegations establish an environment that was permeated with discriminatory

animus towards female employees at all levels for a period of *years*.  By way of example only:

- Defendant Hediger referred to Ms. Moazzaz as a "bitch," a "commander" and the "little one." ¶86, 113.  Ms. Moazzaz reported these comments to the Company's former Global Head of Technology & Operations, who in turn escalated it further, but Defendant Hediger was never disciplined.  ¶¶88-90, 102-103, 125.

- Defendant Hijkoop told Ms. Moazzaz that she needed to "be nicer" and "more like the woman that he had researched on the internet [referring to research he conducted on Ms. Moazzaz] that participates in community service activities and supports not-for-profit organizations." ¶¶92-93.

- Defendant Hijkoop also claimed that Ms. Moazzaz has "sharp elbows" during a C-Suite talent meeting review.   The same comment also was made in 2017 by Christopher Townsend, MetLife's former Head of Asia. ¶94.

- Ms. Moazzaz was denied a promotion to the EVP level after complaining that men were being promoted in her stead, on the basis that she was "too mean, condescending and shouts."   ¶¶96-98.  However, she was told that if she were "nicer" she would be considered for a promotion the following year. ¶99.

- A coach hired by MetLife and reporting to MetLife's HR department told Ms. Moazzaz that "if you want to be promoted, you need to choose between being pretty and being smart because men can't put you in both boxes." He also told her to "wear less makeup" and "dress conservatively." ¶¶104-112.

- Ms. Moazzaz was subject to investigations for over a year because of Defendants' discriminatory perception of her work performance. ¶¶100-110, 119-127.

- Ms. Moazzaz was vaguely criticized for the "tone" of her writing. ¶¶122-124.

- The Company's leadership objected to a mural that Ms. Moazzaz had installed supporting gender equality, claiming it was "too feminine." ¶¶130-134.

- Other women at the Company shared Ms. Moazzaz's complaints that male leadership used gendered terms to describe their performance and behavior, such as that they were being "too aggressive" and emotional. ¶¶115-118.

- Ms. Moazzaz was retaliated against and terminated shortly after her complaints of discrimination. ¶¶136-143, 148.

These are but examples of the gender-based hostility to which Ms. Moazzaz was subjected during her employment. ¶85. Of course, "a plaintiff need not provide a list of every alleged discriminatory remark and incident of harassment to state a claim for hostile work environment." Hagan v. City of N.Y., 39 F. Supp. 3d 481, 500 (S.D.N.Y. 2014). However, even if these allegations were exhaustive, this alleged litany of misogynistic conduct is sufficient to establish a hostile work environment. See, e.g., Petterson v. State Univ. of New York at Stony Brook, No. 15 Civ. 1228 (DRH), 2019 WL 367840, at *7 (E.D.N.Y. Jan. 30, 2019) (use of the term "bitch" and other comments demeaning towards women, coupled with evidence of retaliation following complaints, evidence of hostile work environment); Pilgrim v. McGraw-Hill Companies, Inc., 599 F. Supp. 2d 462, 491 (S.D.N.Y. 2009) (denying *summary judgment* on

13

a hostile work environment claim where supervisor referred to women as "bitches" and took away the plaintiff's responsibilities after she complained about discrimination).

In addition, though unnecessary, the AC alleges that other women were subjected to similar gender-based harassment.  See, e.g., Patane v. Clark, 508 F.3d 106, 114 (2d Cir. 2007) ("a plaintiff need only allege that the she suffered a hostile work environment because of her gender, not that all of the offensive conduct was *specifically* aimed at her") (emphasis in original); Leibovitz v. New York City Transit Auth., 252 F.3d 179, 190 (2d Cir. 2001) ("we recognize that evidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment discrimination").

In seeking dismissal of Plaintiff's hostile work environment claim, Defendants cite to a series of cases standing for the unremarkable proposition that isolated or "sporadic" comments do not give rise to a hostile work environment.  However, an examination of those cases makes clear that they involve far less pervasive conduct than is at issue in this instant case.  For example, in Alvarado v. Nordstrom, Inc., 685 F. App'x 4, 8 (2d Cir. 2017), in a summary order with no precedential effect, the plaintiff could only point to three comments made during his entire employment.  Id. at 8.  Further, the court noted that the plaintiff had admitted that he was not even offended by at least one of the comments.  Id. at 6.  In contrast, here, Plaintiff has pointed to numerous comments made by her supervisors, all of which she complained about. See also Carter v. Verizon, No. 13 Civ. 7579 (KPF), 2015 WL 247344, at *10 (S.D.N.Y. Jan. 20, 2015) (granting *unopposed* motion to dismiss because sporadic "snide remarks" and "failure to say 'Good Morning'" did not arise to level of hostile work environment).

Defendants' reliance on Lebowitz v. New York City Dep't of Educ., 407 F. Supp. 3d 158,181 (E.D.N.Y. 2017) is particularly confounding given that, in Lebowitz, the court found

14

that the plaintiff *had* alleged the existence of a hostile work environment where the defendant made comments about other individuals in the protected class, threatened the plaintiff's employment and made disparaging remarks about the plaintiff's performance and behavior, all of which (and more) are alleged in the AC in this case.  Id. at 181.

Defendants further argue that Plaintiff's hostile work environment cause of action under the NYCHRL should be dismissed because the AC does not link the comments and action taken against her to her gender.  This claim simply ignores the allegations in the AC.  As a threshold matter, it is outrageous for Defendants to claim that calling a woman a "bitch" is somehow gender neutral.  Similarly, courts have held that stereotypical comments about how women are supposed to behave is evidence of gender discrimination.  See, e.g., Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989) ("An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind."); Quinby v. WestLB AG, No. 04 Civ. 7406 (WHP), 2007 WL 1153994, at *7 (S.D.N.Y. Apr. 19, 2007) (comments that employ female stereotypes or offensive gendered language, such as remarks that women are "'high maintenance in the context of work' and that there is a 'girlie way' of doing work which differs from the 'right way,' **strongly support an inference of discrimination**") (emphasis added).

Finally, to the extent that Defendants are arguing that facially neutral actions taken against Plaintiff cannot contribute to a hostile work environment, they are wrong.  "[N]eutral incidents may be included . . . among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex."  Alfano v. Costello, 294 F.3d 365, 378 (2d Cir. 2002).  Here, in light

of the various examples of disparate treatment between men and women offered in the AC, as well as the gendered comments directed at Plaintiff and other female employees, there is a reasonable basis to conclude that all of the negative treatment Plaintiff experienced was causally related to her gender.  See Kaytor v. Elec. Boat Corp., 609 F.3d 537, 548 (2d Cir. 2010) ("So long as there is some evidentiary basis for inferring that facially sex-neutral incidents were motivated by the plaintiff's gender, the ultimate question of whether such abuse was 'because of' the plaintiff's gender . . . is a question of fact for the factfinder.").

### D.    The AC Alleges a Discriminatory Pay Claim

Defendants seek dismissal of Plaintiff's claim that she was paid less than similarly situated men on the same grounds that they seek dismissal of Plaintiff's claims under the EPA, namely, that the AC allegedly fails to identify any male comparators.  See Def. Br. at pp. 15-16.  As explained above, the AC does, in fact, identify sufficient comparators to survive a motion to dismiss.  See supra at pp. 5-10.  However, even assuming, arguendo, that the AC fails to identify male comparators, Defendants' motion to dismiss Plaintiff's disparate pay claims is fatally flawed.  As the Second Circuit has recently ruled, "a claim for sex-based wage discrimination can be brought under Title VII **even though no member of the opposite sex holds an equal but higher paying job**." Lenzi v. Systemax, Inc., 944 F.3d 97, 110–11 (2d Cir. 2019) (emphasis added, internal quotations omitted).  "Federal standards that are applied to employment discrimination claims brought under Title VII also apply to claims brought under the NYSHRL and the NYCHRL." Hardekopf v. Sid Wainer & Son, No. 02 Civ. 3251 (LAP), 2004 WL 2199502, at *5 (S.D.N.Y. Sept. 29, 2004).  Thus, unlike under the EPA, Plaintiff is under no obligation to identify a male comparator under the NYSHRL and the NYCHRL.  Defendants' reliance on dated case law is unavailing, and their motion should be denied on this point.

16

E.     **The AC Alleges that Plaintiff's Termination was Discriminatory**

Defendants similarly claim that Plaintiff's discriminatory termination claim should be dismissed because "she does not allege any acts that could give rise to a reasonable inference of discriminatory animus." Def. Br. p. 16. This statement is preposterous. As demonstrated above, Plaintiff has alleged ample facts giving rise to an inference of discriminatory animus. See *supra* at pp. 11-16. See, e.g., Zambrano-Lamhaouhi v. New York City Bd. of Educ., 866 F. Supp. 2d 147, 171 (E.D.N.Y. 2011) (comments evincing "stereotypical views regarding the commitment and competence of pregnant women and new mothers" support a finding of discriminatory animus); Quinby, 2007 WL 1153994, at *7 (comments that employ female stereotypes or offensive gendered language, such as remarks that women are "high maintenance in the context of work" and that there is a "girlie way" of doing work which differs from the "right way," strongly support an inference of discrimination); Zubulake v. UBS Warburg LLC., 382 F. Supp. 2d 536, 544 (S.D.N.Y. 2005) (holding that other acts of discrimination are probative of intent); Glaski v. State of Conn., Dep't of Admin. Servs., No. 86 Civ. 929 (JAC), 1991 WL 498669, at *9 (D. Conn. May 9, 1991) (citing the plaintiff's testimony that "she has applied for positions in the Bureau of Purchases and Bureau of Collection Services and been rejected despite her qualifications, and that less qualified males were promoted in her stead" as evidence supporting denial of summary judgment as to the plaintiff's Title VII claim).

Likewise, the way in which Ms. Moazzaz has been treated in comparison to similarly situated men (for example, pay, promotions, harassment, etc.) also supports an inference of discrimination. Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001) ("a showing of disparate treatment [*i.e.*, that similarly situated men were treated more favorably than

Ms. Moazzaz] [is] a common and especially effective method of establishing the inference of discriminatory intent.").

Finally, Ms. Moazzaz has identified at least five other women who also have been discriminated against, which further supports her claim of discriminatory intent.  ¶116; see also Zubulake, 382 F. Supp. 2d 536 (prior acts of discrimination probative of intent); Rifkinson v. CBS, Inc., No. 94 Civ. 7985 (KTD)(JCF), 1997 WL 634514 (S.D.N.Y. Oct. 14, 1997) (same), and many more.

### F.    The AC Alleges a Discriminatory Failure to Promote Claim

Defendants' motion to dismiss Ms. Moazzaz's discriminatory failure to promote claim hinges on their false claim that Ms. Moazzaz failed to allege that the refusal to promote her was based on her gender.  Once again, Defendants ignore the allegations in the AC.  In addition to the foregoing, **Defendants actually told Ms. Moazzaz that she would not be promoted because she was "too mean, condescending and shouts," and needed to be "nicer."**  ¶¶96-99.  Such references are classic examples of critiques aimed at women that are never levied at their male counterparts.  Indeed, punishing women in this way is illegal:

> An employer who objects to aggressiveness in women but whose positions require this trait place women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not.  Title VII lifts women out of this bind.

490 U.S. 228, 251 (1989).

Moreover, the AC alleges that comparator Michael Zarcone was promoted to the Executive Vice President position that Ms. Moazzaz was denied.  ¶152.  Importantly, Mr. Zarcone was promoted despite only having a fraction of the responsibilities that Ms. Moazzaz

ably performed throughout her employment.[3]  Thus, Defendants' motion to dismiss Plaintiff's discriminatory promotion claim should be denied.  See, e.g., Germain v. Cty. of Suffolk, No. 07 Civ. 2523 (ADS)(ARL), 2009 WL 1514513, at *7 (E.D.N.Y. May 29, 2009) (denying motion for summary judgment where "[t]here is some objective evidence . . . that would suggest she was a stronger candidate for promotion than [the promoted individual]").

Finally, each allegation of discrimination serves to support the claim that each adverse action was motivated by discriminatory animus.  See, e.g., Quinby, 2007 WL 1153994, at *7 (male colleagues receiving "significantly higher bonuses" was evidence of discrimination relating to other adverse decisions).

## IV.   THE AC SETS FORTH A RETALIATION CLAIM

### A.   Legal Standard

In arguing that Plaintiff's retaliation claims should be dismissed, Defendants set forth the elements of a *prima facie* case of a retaliation claim under the NYSHRL and the NYCHRL before claiming that the AC has not alleged sufficient facts to establish those elements.  Def. Br. at pp. 18-20.  As explained *supra* at p. 6, however, an employment discrimination plaintiff **need not plead a *prima facie* case of discrimination** in order to survive a motion to dismiss.

The standards of liability for retaliation are similar under the NYSHRL and NYCHRL. Under the NYCHRL, to establish retaliation, a plaintiff need only show that the conduct at issue is "reasonably likely to deter a person from engaging in protected activity."  Rozenfeld v. Dept.

---

[3]     Defendants' reliance on Shein v. New York City Dep't of Educ., No. 15 Civ. 4236 (DLC), 2016 WL 676458 (S.D.N.Y. Feb. 18, 2016) for the proposition that Plaintiff cannot use Mr. Zarcone's promotion as evidence of discriminatory animus is inapposite.  In Shein, the plaintiff failed to allege that her supposed comparators were treated differently for engaging in any of the same conduct that she did.  Id. at *6.  In contrast, the AC alleges that Mr. Zarcone was promoted despite having fewer responsibilities than Plaintiff.

of Design & Constr., 2012 WL 2872157, at *13 (E.D.N.Y. 2012).  Under the NYSHRL, although a plaintiff must establish an "adverse action," the definition of that term in the retaliation context – an act that "could well dissuade a reasonable worker from making or supporting a charge of discrimination" – is similar to the NYCHRL standard.

### B.      The AC Pleads Claims for Retaliation Under the NYSHRL and NYCHRL

First, Defendants argue that the AC does not allege a causal connection between Ms. Moazzaz's protected activity and Defendants' retaliatory conduct.  Once again, the existence of a causal connection is only relevant insofar as it allows a plaintiff to establish her *prima facie* case, which is not required at the pleading stage.  *Supra* at p. 6.  In any event, the AC does allege facts sufficient to establish a causal connection.  By way of example, Ms. Moazzaz complained about discrimination in November 2017.  ¶96.  She was denied a promotion three months later and then received a negative performance review that reduced her bonus.  ¶¶97, 100.  This gap is sufficient to establish a causal connection.  See, e.g., Summa v. Hofstra, 708 F.3d 115, 127 (2d Cir. 2013) (seven month gap is sufficient); Guzman v. News Corp., No. 09 Civ. 09323(LGS), 2013 WL 5807058, at *21 (S.D.N.Y. Oct. 28, 2013) (seven month gap is sufficient).  Ms. Moazzaz was then subjected to a humiliating coaching process, a review process in which 20 colleagues were asked to fill out a survey about her and two bogus investigations.  ¶¶109-110.

Moreover, Ms. Moazzaz was terminated 11 months after she complained about discrimination to Ms. Tate-Gowins and Mr. Hediger, and less than seven months after she complained about discrimination in MetLife's hiring practices.  ¶¶121, 139.  This, too, is within the range of what constitutes temporal proximity in the Second Circuit.  See, e.g., Grant v. Bethlehem Steel, 622 F.2d 43, 45 (2d Cir. 1980) (eight month gap sufficient); Mahony v. KeySpan Corp., No. 04 Civ. 554 (SJ), 2007 WL 805813, at *6 (E.D.N.Y. Mar. 12, 2007)

(denying **summary judgment** where firing was 13 months after complaint).  That is particularly true here where: (i) there was a deterioration of Ms. Moazzaz's relationships following her September 2018 complaints (¶¶137-148); and (ii) the retaliatory treatment culminated in Mr. Khalaf terminating Ms. Moazzaz at the first opportunity after he assumed the CEO role (¶148). See, e.g., Wallengren v. Samuel French, Inc., 39 F. Supp. 2d 343, 344-45 (S.D.N.Y. 1999) (denying summary judgment where plaintiff was fired more than one year after disclosing disability and, *inter alia*, the plaintiff's relationship with his supervisor diminished after disclosure and plaintiff's supervisor no longer confided in plaintiff or solicited his opinion); Behringer v. Lavelle Sch. for Blind, 08 Civ. 4899 (JGK), 2010 WL 5158644 at *11 (S.D.N.Y. Dec. 17, 2010) (inference created, and summary judgment ultimately denied, where the plaintiff claimed that defendant "engaged in escalating, negative conduct towards her over an eight-month period [after disclosing her disability] until an opportunity to fire her presented itself.").

In any event, "[t]emporal proximity is only one way to establish a plausible claim of retaliation."  See Garcia v. Coll. of Staten Is., 11 Civ. 2252 (KAM)(LB), 2012 WL 3930448, at *9 (E.D.N.Y. July 31, 2012).  Here, in addition to temporal proximity, given her objectively outstanding performance (¶¶31-48, 129), Ms. Moazzaz will be able to establish that any non-discriminatory justification proffered by Defendants is false, which in itself (along with the *prima facie* case) can establish discrimination.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 148 (2000) ("A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").  Ms. Moazzaz will also be able to establish that similarly situated men who did not engage in protected activity were retained and even promoted under similar circumstances, whereas Ms. Moazzaz was terminated.  See ¶152; Abdu-Brisson,

239 F.3d at 468 ("a showing of disparate treatment [*i.e.*, that similarly situated men were treated more favorably than Ms. Moazzaz] [is] a common and especially effective method of establishing the inference of discriminatory intent.").

Defendants also claim that Ms. Moazzaz's complaints concerning diversity, including those contained in the candidate strategy she prepared, are not protected activity.  Defendants' argument misstates the law and misrepresents the allegations.  A complaint of a lack of diversity qualifies as protected activity if it concerns employment practices.  See, e.g., Gilford v. N.Y.S. Office of Mental Health, No. 17 Civ. 8033 (JPO), 2020 WL 1529359, at *3 (S.D.N.Y. Mar. 31, 2020) (holding that complaints of discrimination in "a specific employment practice" was protected).  Notably, even the case cited by Defendants, Fenner v. News Corp., No. 09 Civ. 09832 (LGS), 2013 WL 6244156, at *25 (S.D.N.Y. Dec. 2, 2013) – decided on summary judgment – explained that a complaint about a lack of diversity would be protected if it related to "an employment policy that he reasonably believed to be discriminatory."  Id. at *25.

Here, Ms. Moazzaz was not simply musing about diversity or asking a question about a lack thereof.  See Hood v. Pfizer, Inc., 322 F. App'x 124, 131 (3d Cir. 2009) (relied upon by Defendants despite the fact that this was a case decided on *summary judgment* and the only relevant holding was that a general inquiry about diversity was not protected activity under the law).  Rather, she complained specifically about Defendants' discriminatory hiring and retention practices that led to a lack of diversity, including, *inter alia*, complaining that: (i) one particular manager repeatedly attempted to terminate African American employees without justification; (ii) it was unacceptable that MetLife had not hired an African American officer in more than two years; (iii) MetLife had a practice of prioritizing the promotions of senior employees rather than more diverse junior employees; (iv) the Company failed to have a recruiting strategy aimed at

22

increasing diversity; and (v) the Company failed to hire minorities and employ women in senior positions. ¶¶121, 139.  These complaints are plainly protected.

Defendants also argue that Plaintiff's retaliation claims as against Defendants Khalaf and Kandarian in particular fail because the conduct alleged – ostracizing Ms. Moazzaz and favoring others at her expense following her complaints – are not adverse employment actions.  ¶¶12-14, 140-147.  However, as explained above, under the NYCHRL, there is no requirement that Plaintiff plead an adverse employment action and, under the NYSHRL, the appropriate question is whether this conduct could dissuade a reasonable worker.  New York courts have found similar conduct to be actionable retaliation.  See, e.g., O'Rourke v. Nat'l Foreign Trade Council, Inc., 110 N.Y.S.3d 104, 105 (1st Dep't 2019) (denying dismissal of NYCHRL discrimination and retaliation claim where employee alleged that after protected activity her supervisor "excluded her from projects, ignored and hid information from her; publicly undermined her; and took away her planning responsibilities").

Finally, Defendants' claim that the AC fails to allege that Defendants Khalaf and Kandarian were aware that she authored the protected complaint contained in the candidate strategy is disingenuous.  The AC alleges that: (i) Ms. Moazzaz "led" Mr. Lippert's campaign for CEO; (ii) Ms. Moazzaz authored the candidate strategy; (iii) Defendants Khalaf and Kandarian were made aware of the strategy; (iv) it was within Ms. Moazzaz's job responsibilities to prepare such strategies and she had done so many times; and (iv) Defendants Khalaf's and Kandarian's treatment of Ms. Moazzaz worsened after they were made aware of the strategy.  ¶¶137-148. Certainly these allegations are sufficient to raise at least an inference that Defendants Khalaf and Kandarian were aware that Ms. Moazzaz authored the protected complaints.

## V.      THE AC STATES A CLAIM AGAINST THE INDIVIDUAL DEFENDANTS

Individual liability exists "if the individual actually participates in the conduct giving rise to [the] discrimination, or aids and abets same." Pryor v. Jaffe & Asher, LLP, 992 F. Supp. 2d 252, 257 (S.D.N.Y. 2014) (quotation omitted).  Importantly, "actual participation" is not limited to instances in which an individual participates in the primary violation.  An individual also is liable if that individual failed to take appropriate investigative or remedial measures.  See, e.g., Lewis v. Triborough Bridge & Tunnel Auth., 77 F. Supp. 2d 376, 383 (S.D.N.Y. 1999) (holding that a supervisor need not make comments or unwelcome advances to subject himself to liability, as the "case law establishes beyond cavil that a supervisor's failure to take adequate remedial measures can rise to the level of 'actual participation'"); Magnotti v. Crossroads Healthcare Mgmt. LLC, No. 14 Civ. 6679 (ILG)(RML), 2016 WL 3080801, *2 (E.D.N.Y. May 27, 2016) (same); E.E.O.C. v. Suffolk Laundry Servs., Inc., 48 F. Supp. 3d 497, 522 (E.D.N.Y. 2014) (observing that liability can be based on "condonation or tacit acceptance.").

In arguing for dismissal of the individual Defendants, Defendants: (i) misrepresent the allegations in the AC; (ii) falsely suggest that a plaintiff must allege that an individual engaged in conduct that is actionable on its own, rather than the actual standard of liability – which is that the individual Defendant must merely have participated in or aided and abetted the conduct; and (iii) repeat the inaccurate claim, debunked *supra* at pp. 11-23, that the underlying conduct to which Ms. Moazzaz was subjected does not give rise to liability.

With respect to Defendant Khalaf, the AC alleges that he: (i) influenced Ms. Moazzaz's discriminatory compensation (¶49); (ii) put his head in the sand with respect to discriminatory comments and conduct (¶102); and (iii) subjected Ms. Moazzaz to discriminatory disparate treatment and retaliatory conduct following his receipt of her protected complaints (¶¶145-147).

24

In addition, most critically, **Ms. Moazzaz was terminated just eight days after Defendant Khalaf became CEO, which certainly raises an inference that he was involved in the decision to terminate her (or made it).**  ¶148.  Thus, to the extent that any of Ms. Moazzaz's claims of discrimination or retaliation survive, Defendant Khalaf is an appropriate individual Defendants because he "actually participated" in and/or failed to remedy the conduct alleged.

With respect to Defendant Kandarian, the AC alleges myriad ways in which he engaged in, condoned and acquiesced to discriminatory and retaliatory conduct, including: (i) **setting Ms. Moazzaz's discriminatory compensation** (¶49); (ii) failing to take remedial action in response to Ms. Moazzaz's protected complaints (¶¶102-103); and (iii) affirmatively retaliating against Ms. Moazzaz by refusing to speak with or acknowledge her (¶¶142-143).

Mr. Hijkoop, Ms. Podlogar and Mr. Hediger also are alleged to have **set Ms. Moazzaz's discriminatory compensation.**  ¶49.  In addition, Defendants' argument that the actionable comments made by Mr. Hijkoop and Mr. Hediger are insufficient insofar as they do not, on their own, create a hostile work environment, is misplaced.  The law is not that an individual must have engaged in conduct independently sufficient to create a hostile work environment.  Rather, the individual need only have "actually participated" in the hostile work environment, and Mr. Hijkoop and Mr. Hediger certainly did so through their discriminatory comments and conduct.  Finally, the argument that Ms. Podlogar is not liable for the failure to promote because that claim is not actionable in the first instance is unavailing for the reasons laid out *supra* at pp. 18-20.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion to Dismiss Plaintiff's AC should be

denied in its entirety.

Dated: April 24, 2020
       New York, New York                        Respectfully submitted,

                                                 **WIGDOR LLP**

                                                 By: _____
                                                     Douglas H. Wigdor
                                                     Michael J. Willemin
                                                     Taylor J. Crabill

                                                 85 Fifth Avenue
                                                 New York, NY 10003
                                                 Telephone:  (212) 257-6800
                                                 Facsimile:  (212) 257-6845
                                                 dwigdor@wigdorlaw.com
                                                 mwillemin@wigdorlaw.com
                                                 tcrabill@wigdorlaw.com

                                                 *Attorneys for Plaintiff*