UNITED STATES DISTRICT COURT
<u>SOUTHERN DISTRICT OF NEW YORK</u>

MONA MOAZZAZ,

Plaintiff,

-v-

METLIFE, INC., et al.,

Defendants.

19-CV-10531 (JPO)

<u>OPINION AND ORDER</u>

J. PAUL OETKEN, District Judge:

Plaintiff Mona Moazzaz brings this employment discrimination case against Defendants

MetLife, Inc., Michel Khalaf, Steven Kandarian, Frans Hijkoop, Susan Podlogar, and Gary

Hediger.  Moazzaz claims that MetLife, Khalaf, Kandarian, and Podlogar violated the Equal Pay

Act, 29 U.S.C. § 206 *et seq*., and the New York Equal Pay Act, New York Labor Law

("N.Y.L.L.") § 194 *et seq*., by paying her a lower salary and bonus than was paid to her similarly

situated male colleagues.  She also claims that all Defendants committed gender discrimination

and retaliation, in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec.

Law §§ 290–97, and the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin.

Code §§ 8-101–8-131.  Defendants now move to dismiss the Complaint for failure to state a

claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons that follow,

Defendants' motion is granted in part and denied in part.

**I.      Background**

The following facts are drawn from the Complaint and are assumed true for purposes of

this motion.

In 2012, MetLife hired Moazzaz, an MBA-holder with experience at "prestigious"

consulting firms, as a Vice President in its Global Technology and Operations division.  (Dkt.

No. 20 ¶¶ 31–32.)  For two years, she performed not only the tasks associated with her position

as Vice President but also various reporting, recruitment, and communications tasks.  (Dkt. No. 20 ¶¶ 33–37.)  In recognition of these "incremental responsibilities," Moazzaz was promoted to the position of Senior Vice President and Chief Administrative Officer in 2014.  (Dkt. No. 20 ¶ 38.)  At the same time that she was promoted, Moazzaz was charged with serving as Interim Global Head of Digital Strategy for MetLife.  (Dkt. No. 20 ¶ 39.)  Moazzaz held the Interim Global Head position for nearly three years, until 2017.  (*Id*.)  Across her time with MetLife, Moazzaz allegedly "received the highest possible performance ratings virtually every year and was consistently ranked in the top 5 or 10% when it came to the performance of the Company's leaders."  (Dkt. No. 20 ¶ 3.)  In November 2018, MetLife retained LinkedIn to conduct an employee engagement survey, which resulted in Moazzaz receiving the highest rating of any manager in the Global Technology and Operations division.  (Dkt. No. 20 ¶ 129.)

### A.      Work Environment and Termination

Despite Moazzaz's successes at MetLife, she allegedly faced "blatantly discriminatory and gender based" conduct in the workplace.  (Dkt. No. 20 ¶ 86.)  Defendant Hediger, MetLife's Head of Human Resources for Global Technology and Operations, referred to Moazzaz as a "bitch" and a "commander" to colleagues in 2014.  (*Id*.)  When Hediger's comments were reported to Defendant Hijkoop, MetLife's former Chief Human Resources Officer, Hijkoop declined to discipline or reprimand him.  (Dkt. No. 20 ¶¶ 88–89.)  Instead, Hijkoop, in 2015, instructed Moazzaz to "be nicer," like a woman who "participates in community service activities and supports not-for-profit organizations."  (Dkt. No. 20 ¶¶ 92–93.)  Separately, in a 2017 review of MetLife talent, Hijkoop suggested that Moazzaz was difficult to work with and had "sharp elbows."  (Dkt. No. 20 ¶ 94.)  And in 2018, Hediger, "allowed to act in a discriminatory manner without rebuke," began referring to Moazzaz as the "little one" in meetings where she was not present.  (Dkt. No. 20 ¶ 113.)

In February 2018, Defendant Podlogar, Hijkoop's successor as Chief Human Resources Officer, denied Moazzaz a promotion on the basis that she was "too mean, condescending and shouts." (Dkt. No. 20 ¶ 98.) Echoing Hijkoop, Podlogar stated that Moazzaz might be promoted if she were "nicer." (Dkt. No. 20 ¶ 99.) Contemporaneously, Podlogar gave Moazzaz a performance rating lower than the one recommended by Moazzaz's manager, thereby reducing her bonus, and initiated an investigation into Moazzaz "[f]or the same . . . reasons." (Dkt. No. 20 ¶ 100.) Podlogar retained a "leadership coach" for Moazzaz, who would provide Human Resources "with periodic status reports on the progress of his coaching" over the course of six months. (Dkt. No. 20 ¶¶ 101, 104–05.) The leadership coach interviewed and surveyed over 20 of Moazzaz's colleagues and then informed her that she had "to choose between being pretty and being smart because men [could not] put [her] in both boxes." (Dkt. No. 20 ¶¶ 110–11.) He also recommended that Moazzaz "'wear less makeup' and 'dress conservatively.'" (Dkt. No. 20 ¶ 112.)

Moazzaz ran afoul of Human Resources again in mid-2018, when a male subordinate complained that she "did not trust him," as indicated by her "tone" and the fact that "her emails were 'too short.'" (Dkt. No. 20 ¶¶ 119, 122.) Human Resources opened a "second and duplicative investigation into Moazzaz" as a function of the complaint. (Dkt. No. 20 ¶¶ 119–27.) When she was interviewed as a part of the investigation, Moazzaz allegedly informed Human Resources that the complainant "continually attempted to lay off very high-performing African Americans on his team without justification"; that "gender-based critiques like 'tone' only perpetuate[] a culture that supports the poor treatment of women in the workplace"; and that MetLife "perpetuated a culture in which women are discriminatorily critiqued," as evidenced by the derogatory language used by Hediger and Hijkoop to describe or refer to her. (*Id.*) Human

Resources responded that Moazzaz's "complaints about discriminatory conduct were 'surprising,'" even though Moazzaz had previously discussed "MetLife's lack of diversity" with Human Resources and had reported Hediger's comments. (Dkt. No. 20 ¶¶ 121, 128). Human Resources "never followed up" on Moazzaz's charge that her male subordinate regularly attempted to terminate African American employees without justification. (*Id.*).

Later that year, Moazzaz backed Martin Lippert, the former Global Head of Technology and Operations, in his bid to replace MetLife's outgoing CEO. She drafted a "CEO candidate strategy" for Lippert that "exposed many major gaps in diversity at MetLife" and called on MetLife to "revamp [its] diversity recruitment and retention strategy." (Dkt. No. 20 ¶¶ 138–39.) Defendants Kandarian and Khalaf, MetLife's former and current CEOs, allegedly received or were "made aware of" Moazzaz's candidate strategy. (Dkt. No. 20 ¶¶ 140–41.) Kandarian stopped engaging with Moazzaz in the office, and Khalaf declined to invite her to a corporate strategy session for MetLife leaders. (Dkt. No. 20 ¶¶ 143, 147.) In early 2019, Khalaf was selected over Lippert as the next CEO, and eight business days after he assumed the role, Moazzaz was terminated without notice. (Dkt. No. 20 ¶ 148.)

**B.     Pay Disparity**

While Moazzaz was at MetLife, her salary, bonus, and other compensation were either determined or influenced by Hediger, Hijkoop, Podlogar, Kandarian, and Khalaf. (Dkt. No. 20 ¶ 49.) Moazzaz alleges that this group elected to pay her between $105,000 and $525,000 less than it elected to pay nine men in similar or lesser leadership positions at MetLife. (Dkt. No. 20 ¶¶ 52–83.)

Per the Complaint, Moazzaz was responsible for the following tasks, among others, as Senior Vice President, Chief Administrative Officer, and Interim Global Head of Digital Strategy:

- Executing MetLife's acquisitions and divestitures (Dkt. No. 20 ¶ 45);
- Managing MetLife's global real estate, including "the end-to-end buildout of new MetLife worksites" (Dkt. No. 20 ¶ 47);
- Designing operating models and organizational structures for MetLife divisions (Dkt. No. 20 ¶ 44);
- Directing multiyear digital investments to improve MetLife's technologies, platforms, and data analytics (Dkt. No. 20 ¶ 39);
- Managing MetLife's global corporate security (Dkt. No. 20 ¶ 47); and
- Designing and managing recruitment, training, and skills-development programs for MetLife associates and leaders (Dkt. No. 20 ¶ 43).

In carrying out these tasks, Moazzaz managed 1,500 employees and contractors, oversaw projects worth hundreds of millions of dollars, and provided communications and other services to tens of thousands of MetLife associates and leaders. (Dkt. No. 20 ¶¶ 39–47, 58.)

 Moazzaz alleges that she was paid substantially less than the following two men whose work she oversaw, either in her capacity as Chief Administrative Officer or as Interim Global Head of Digital Strategy:

- Ed Spehar, who served as the Europe, Middle East and Africa Chief Financial Officer and was "responsible for managing finances for the [] region." (Dkt. No. 20 ¶ 68.) The Complaint specifies that Spehar "submitt[ed] budgets to [] Moazzaz for approval," Moazzaz reviewed Spehar's reports on whether the region "was on pace to meet its financial targets and budget," and Moazzaz updated MetLife's Head of Governance and Chief Financial Officer on the region's finances. (Dkt. No. 20 ¶¶ 68–69.) Spehar managed a staff of 100. (Dkt. No. 20 ¶ 70.)
- Steve Weinreb, who served as Head of Asia IT and was "responsible for the application and development of technology MetLife provided to customers in Asia." (Dkt. No. 20 ¶ 56.) The Complaint specifies that Moazzaz "oversaw" Weinreb's work, reviewing and approving Weinreb's business proposals and reporting on Weinreb's initiatives to the CEO. (Dkt. No. 20 ¶ 57.) Weinreb managed a staff of 1,100. (Dkt. No. 20 ¶ 58.)

Moazzaz also alleges that she was paid substantially less than Greg Baxter, who was hired as MetLife's Chief Digital Officer in 2017. The Complaint describes the Chief Digital Officer role

as "part of the [Global Head of Digital Strategy] role" that Moazzaz filled on an interim basis. (Dkt. No. 20 ¶ 52.)

The Complaint lists an additional six men who were paid more than Moazzaz, including MetLife's Head of Japan Operations, Global Head of Operations, U.S. Marketing Head, Head of M&A, Head of Investor Relations, and Head of Compliance.  (Dkt. No. 20 ¶¶ 53–83.)  Moazzaz allegedly collaborated on projects with, reviewed workproduct from, or reported to corporate officers regarding each of these men.  (*Id*.)  Furthermore, Moazzaz's role was either "senior to" or "similar to" the roles held by each of these men.  (*Id*.)

Moazzaz alleges that she was paid less than her male comparators because of her gender. She contends that, "at MetLife, women . . . are unfortunately paid substantially less than men who perform less or equal work."  (Dkt. No. 20 ¶ 51.)  The Complaint notes that a third-party investment firm assessed MetLife's gender pay gap and awarded the company an "F."  (Dkt. No. 20 ¶ 84.)

### C.    Procedural History

On November 13, 2019, Moazzaz brought this action.  (Dkt. No. 1.)  She later filed a charge of discrimination with the Equal Employment Opportunity Commission (Dkt. No. 20 ¶ 20) and an amended complaint (Dkt. No. 20).  On April 3, 2020, Defendants moved to dismiss the Complaint.  (Dkt. No. 26.)

## II.    Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In considering the motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002).  And

while "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678, the Court must draw "all inferences in the light most favorable to the nonmoving party[]," *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

## III.   Discussion

Defendants argue that all of Moazzaz's claims are insufficiently pleaded.  They contend (1) that the equal pay claims fail because Moazzaz does not identify a male comparator whose job "involved the same duties, skills, efforts or responsibilities" as her job (Dkt. No. 26 at 8.); (2) that the hostile work environment claims fail because the interactions alleged are no more than "petty slights and trivial inconveniences" (Dkt. No. 26 at 13 (internal quotation marks omitted)); (3) that the discriminatory termination and failure to promote claims fail because Moazzaz alleges "no facts to show an inference of discrimination on the basis of her gender" (Dkt. No. 26 at 16–17); (4) that the retaliation claims fail because the "Complaint is devoid of any facts which plausibly suggest direct proof of retaliatory animus" (Dkt. No. 26 at 20); and (5) that the claims against Khalaf, Kandarian, Hediger, and Hijkook as individuals fail because the Complaint insufficiently alleges their involvement in discriminatory conduct (Dkt. No. 26 at 24–25).  Defendants' arguments are considered in turn.

### A.   Pay Discrimination

The federal Equal Pay Act prohibits employers from discriminating on the basis of sex "by paying wages to employees in [an] establishment at a rate less than the rate [paid] to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility."  29 U.S.C. § 206(d)(1).  To plead prohibited discrimination, plaintiffs typically identify a comparator, or a higher-paid colleague of the opposite gender.  *See Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 480 (2d Cir. 2001).

Plaintiffs and their comparators need not have "identical" jobs, but a higher-paid comparator should not hold a job requiring "greater skill, effort, and responsibility than [the] plaintiff's position." *Id*. The pleading standards for pay discrimination under the New York Equal Pay Act mirror those for the federal Equal Pay Act. *See Rose v. Goldman, Sachs & Co., Inc.*, 163 F. Supp. 2d 238, 243 (S.D.N.Y. 2001). The same generally applies for the NYSHRL and NYCHRL, except these statutes additionally require plaintiffs to allege discriminatory animus. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1312 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742 (1998); *Holness v. Nat'l Mobile Television, Inc.*, No. 09-cv-2601, 2011 WL 1085167, at *2 (E.D.N.Y. Mar. 21, 2011).

In their motion to dismiss, Defendants argue that several of the higher-paid men identified in the Complaint cannot be used as comparators because they work in far-flung offices and are not in the same "establishment" as Moazzaz. Moreover, Defendants contend that the job requirements of all nine higher-paid men are insufficiently pleaded or are too different from Moazzaz's job requirements for the men to serve as comparators. The Court disagrees.

### 1. "[W]ithin any establishment"

The Equal Pay Act and its state analogue target pay discrimination that occurs "within any establishment," 29 U.S.C. § 206(d)(1), or between employees "in the same establishment," N.Y.L.L. § 194(1). Federal regulations explain that "establishment" refers to "a distinct physical place of business rather than to an entire business." 29 C.F.R. § 1620.9(a). Because "each physically separate place of business is ordinarily considered a separate establishment," *id*., Defendants contend that MetLife employees like the Head of Japan Operations and Europe, Middle East and Africa Chief Financial Officer are too "geographically separate" from Moazzaz to be used in support of her pay discrimination claims (Dkt. No. 26 at 10, n.5).

The federal regulations that Defendants cite, however, acknowledge that "unusual circumstances may call for two or more distinct physical portions of a business enterprise being treated as a single establishment."  29 C.F.R. § 1620.9(b).  The regulations provide, as an example, that a single establishment may encompass multiple offices when "a central administrative unit . . . hire[s] all employees, sets wages, and assign[s] the location of employment" and employees' duties are "performed under similar working conditions."  *Id*. Determining the existence of such unusual circumstances is a "fact-intensive assessment." *Barrett v. Forest Laboratories, Inc.*, No. 12-cv-5224, 2015 WL 5155692, at *8 (S.D.N.Y. Sept. 2, 2015).  Accordingly, courts have been loath to make such a determination, one way or another, without the benefit of complete discovery.  *See id.* ("The general approach of [Equal Pay Act cases] has been to decline to determine at the conditional-certification stage whether the plaintiffs will be able to satisfy the 'establishment' requirement."); *Moore v. Publicis Groupe SA*, No. 11-cv-1279, 2012 WL 2574742, at *11 (S.D.N.Y. June 29, 2012) (collecting cases).

At this early stage, Defendants' "establishment" argument presents no reason to discount Moazzaz's comparators stationed abroad.  The Complaint alleges facts from which it can be reasonably infered that MetLife's "central control and administration" of these comparators is sufficient to "support a finding of a single establishment."  *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 287 (S.D.N.Y. 2018) (citing *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 591 n.11 (11th Cir. 1994)).  The foreign comparators all appear to be members of MetLife's leadership team. Per the Complaint, the foreign comparators reported directly to Moazzaz and other centralized MetLife officers, such as the Chief Financial Officer and Head of Governance.  (Dkt. No. 20 ¶¶ 57, 61, 69.)  It is thus improbable that foreign MetLife personnel, instead of, say, Hediger, the Head of Human Resources for Global Technology and Operations, would have been responsible

for the Head of Asia IT's specific salary.  *Cf. Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013,

1017 (11th Cir. 1994) (affirming post-discovery determination that employees worked in

different establishments because "the specific salary to be offered a job applicant is determined

by the local supervisor" and "job applicants are interviewed by local officials and hired upon

their recommendation").  Moazzaz has plausibly pleaded that her proposed comparators, other

members of MetLife's leadership team, were employed in the same establishment.

### 2.    "[E]qual work on jobs the performance of which requires equal skill, effort, and responsibility"

The core tenet of the Equal Pay Act and its state analogue is that employees, irrespective

of their gender, should receive equal pay for equal work.  *E.E.O.C. v. Port Auth. of New York &*

*New Jersey*, 768 F.3d 247, 254 (2d Cir. 2014).  The statutes are not implicated every time

employees of one gender receive greater compensation than employees of another.  Rather, the

statutes are explicitly limited to circumstances in which employees, based on their gender,

receive greater compensation "for equal work on jobs the performance of which requires equal

skill, effort, and responsibility."[1]  29 U.S.C. § 206(d)(1); N.Y.L.L. § 194(1).

Here, Defendants argue that Moazzaz has not adequately pleaded that she and her

higher-paid male comparators performed substantially equal work.  They fault the Complaint as

providing only "a superficial description of the job duties" of the comparators.  (Dkt. No. 26 at

8.)  They downplay Moazzaz's alleged collaboration with her comparators on various projects,

---

[1] As the Second Circuit clarified in *Lenzi v. Systemax, Inc.*, Title VII, and thus the NYSHRL and NYCHRL, have a broader range of concerns than does the Equal Pay Act.  944 F.3d 97 (2d Cir. 2019).  "[A] Title VII plaintiff alleging a discriminatory compensation practice need not establish that she performed equal work for unequal pay.  By its plain terms, Title VII makes actionable *any* form of sex-based compensation discrimination."  *Id*. at 110 (emphasis in original).  Moazzaz's allegations in support of her Equal Pay Act claim bolster but are not strictly necessary for her claims under the NYSHRL and NYCHRL.

stating that "[i]t is hardly surprising — and not at all legally relevant — that Plaintiff had occasion to interact with the [men] in those roles."  (*Id*.)  Finally, they suggest that Moazzaz's allegations that she "actually had greater responsibilities than [some of] her comparators" are self-defeating, as they show that she performed greater work than, not work equal to, that performed by her higher-paid colleagues.  (Dkt. No. 26 at 9.)

 None of Defendants' arguments accords with a fair reading of the Complaint or the governing law.  To sustain a claim under the Equal Pay Act, a plaintiff need not show that her job was "identical" to that held by a higher-paid comparator.  *Tomka*, 66 F.3d at 1311.  Instead, a plaintiff "must establish that the jobs compared entail common duties or content, and do not simply overlap in titles or classifications."  *E.E.O.C.*, 768 F.3d at 255.  To do so, a plaintiff may show, *inter alia*, that she and her comparators had the same title or rank; worked for the same division; shared supervisors; had analogous managerial responsibilities; performed the same tasks; had the same skills or experience; and worked on projects of a similar size or budget.  *See Kassman*, 925 F. Supp. 2d at 471; *Husser v. New York City Dept. of Educ.*, 137 F. Supp. 3d 253, 269 (E.D.N.Y. 2015); *Tomka*, 66 F.3d at 1311.  Perhaps unsurprisingly, given the broad array of factors that bear on "[w]hether two positions are 'substantially equivalent' for Equal Pay Act purposes," this fact-intensive analysis is typically conducted after discovery and treated as "a question for the jury."  *Lavin-McEleney*, 239 F.3d at 480.  The Second Circuit has dismissed Equal Pay Act claims on the pleadings in but a handful of circumstances, most notably when the complaint "stat[es] nothing about the actual content of the work done by the [employees compared]."  *E.E.O.C.*, 768 F.3d at 251 (emphasis removed); *Wu v. Good Samaritan Hosp. Med. Ctr.*, 815 F. App'x 575, 580 (2d Cir. 2020) ("[S]he has not alleged anything about her actual job duties or the actual job duties of her putative comparators.  Accordingly, her allegations fall short

of the pleading standards we impose on [Equal Pay Act] claims.").  Plaintiffs "need not allege

facts establishing each element of a prima facie case of discrimination to survive a motion to

dismiss." *E.E.O.C.*, 768 F.3d at 254.

Moazzaz amply alleges that she and her comparators had common duties and reporting

lines.  Most clearly, Moazzaz shared a common core of tasks with Spehar, the Europe, Middle

East and Africa Chief Financial Officer.  The Complaint specifies that Spehar was responsible

for developing budgets and managing finances for Europe, the Middle East, and Africa.  (Dkt.

No. 20 ¶ 68.)  Moazzaz alleges that she, too, was responsible for work of this nature.  In

"overseeing MetLife's enterprise programs" as Chief Administrative Officer, Moazzaz

"developed . . . financial targets" and "allocated resources" to ensure the delivery of those

targets.  (Dkt. No. 20 ¶ 69.)  Moazzaz not only performed tasks analogous to those performed by

Spehar but also, as Chief Administrative Officer, reviewed and approved Spehar's budgets,

reviewed Spehar's reports on whether the region "was on pace to meet its financial targets," and

updated MetLife's Head of Governance and Chief Financial Officer on regional finances.  (Dkt.

No. 20 ¶ 69.)  Both Spehar and Moazzaz managed MetLife personnel, though Moazzaz's team

was substantially larger.  (Dkt. No. 20 ¶ 70.)

Beyond Spehar, the Complaint details how Moazzaz as Interim Global Head of Digital

Strategy shared a common core of tasks with Weinreb, the Head of Asia IT.  Both Weinreb and

Moazzaz were responsible for the "development of technology MetLife provided to customers."

(Dkt. No. 20 ¶¶ 56, 57.)  Weinreb prepared business proposals "related to the implementation of

technology in Asia" (*id.*), and Moazzaz "pioneered MetLife's first-ever global Digital strategy

across all regions" (Dkt. No. 20 at ¶ 39).  As with Spehar, Moazzaz directly oversaw Weinreb's

work, reviewing and approving his proposals and reporting on his work to MetLife's CEO.  (Dkt.

No. 20 at ¶ 57.)  Weinreb managed a team of 1,100 MetLife personnel, and Moazzaz managed a team of 1,500.  (Dkt. No. 20 at ¶ 58.)

Moazzaz also names Baxter, MetLife's Chief Digital Officer, as a comparator.  Baxter's hiring in 2017 ostensibly relieved Moazzaz from her role as Interim Global Head of Digital Strategy.  The Complaint describes the Chief Digital Officer role as a "part of" the Global Head of Digital Strategy role but provides no further detail on Baxter's responsibilities.  (Dkt. No. 20 at ¶ 53.)  These allegations suffice.  Contrary to Defendants' suggestion, Moazzaz is not relying solely on Baxter's job title or description to plead that he is an appropriate comparator.  (Dkt. No. 26 at 8.)  Instead, she positions herself as Baxter's predecessor in a particular job and alleges that the job was pared back, not expanded, for her higher-paid male colleague.  The predecessor-successor relationship supports a reasonable inference that Moazzaz and Baxter held a wide variety of common duties and performed substantially equal work.  *See Lindsley v. TRT Holdings, Inc.*, 984 F.3d 460, 467 (5th Cir. 2021) (holding that when a plaintiff is "paid less than her . . . immediate predecessors . . . she has established a prima facie case of pay discrimination").

Emphasizing the injustice of her lower compensation, Moazzaz alleges that she actually supervised or otherwise held greater responsibilities than each Spehar, Weinreb, and Baxter.  Defendants, however, remind the Court that the statutes at hand address underpayment for *equal* work.  (Dkt. No. 26 at 8–9.)  Defendants cite a litany of cases that they suggest foreclose Equal Pay Act claims brought by plaintiffs who "took on responsibilities greater than [their] comparator."  (*Id.* (citations omitted).)  Defendants misconstrue the case law.  For instance, *Koster v. Chase Manhattan Bank, N.A.*, 609 F. Supp. 1191 (S.D.N.Y. 1985), did not, as Defendants assert, recognize that "a plaintiff cannot use a comparator with fewer

responsibilities" (Dkt. No. 26 at 10).  It rejected the plaintiff's claim because she "did not do the extensive computer work [her male comparator] did."  *Koster*, 609 F. Supp. at 1194.  *Alexander v. Marriott Int'l, Inc.*, No. 09-cv-2402, 2011 WL 1231029 (D. Md. Mar. 29, 2011), did not dismiss the plaintiff's claim "because the plaintiff maintained more 'managerial' duties than her comparator" (Dkt. No. 26 at 9).  The claim was dismissed because the plaintiff "dr[ew] no parallels between the daily tasks performed by her and those performed by [her comparators]" and did not "allege that she was held to the same standards of accountability to higher-ups as were [her comparators]."  *Alexander*, 2011 WL 1231029, at *5.

More important, Defendants' interpretation of the Equal Pay Act would do violence to the text and purpose of the statute.  The Equal Pay Act demands that plaintiffs and comparators perform "equal work" on a job, not "equal-but-not-greater work."  29 U.S.C. § 206(d)(1); *see also* N.Y.L.L. § 194(1).  A supervisor may perform substantially "equal work" to that performed by a subordinate while also performing *extra* work.  *See* 29 C.F.R. § 1620.14(b).  That a plaintiff holds greater responsibilities does not negate the existence of the lesser responsibilities that she shares with her colleagues.  To hold otherwise would allow employers to "avoid the Act by the simple expedient of loading extra duties onto its female employees" — exacerbating the undervaluation of female labor that the Equal Pay Act sought to correct.  *Riordan v. Kempiners*, 831 F.2d 690, 699 (7th Cir. 1987); *Hein v. Oregon Coll. of Educ.*, 718 F.2d 910, 917 (9th Cir. 1983) (accord); *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 208 (1974) ("The Equal Pay Act is broadly remedial" of the "outmoded belief that a man, because of his role in society, should be paid more than a woman," "and it should be construed and applied so as to fulfill the underlying purposes which Congress sought to achieve." (citation omitted)).

Moazzaz's allegations that she was senior to Spehar and Weinreb, and that her role was broader than Baxter's, do not come to the deteriment of her pay discrimination claims.

Because Moazzaz has plausibly alleged a violation of the Equal Pay Act and its state analogue using Spehar, Weinreb, and Baxter as comparators, the Court need not consider whether the six other higher-paid men listed in the Complaint are appropriate comparators. *See Barrett v. Forest Laboratories, Inc.*, 39 F. Supp. 3d 407, 432 (S.D.N.Y. 2014) ("[B]ecause each of the ten Plaintiffs . . . identifies at least one male comparator . . . [t]hese allegations are sufficient to state a claim"). Moazzaz's Equal Pay Act and New York Equal Pay Act claims survive the motion to dismiss. So too do her pay discrimination claims under the NYSHRL and NYCHRL. From the Complaint's allegation that women are systematically underpaid at MetLife, as well as the allegations discussed *infra* that undergird Moazzaz's hostile work environment claim, the Court reasonably infers that gender animus affected Moazzaz's compensation. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (explaining that many of the factors pertinent to the identification of a hostile work environment "contribut[e] to a permissible inference of discriminatory intent"). These claims may proceed to discovery.

## B. Hostile Work Environment

Alongside her pay discrimination claims, Moazzaz brings hostile work environment claims under the NYSHRL and NYCHRL. Defendants argue that these claims fail because the complained-of conduct bears "no link to [Moazzaz's] gender." (Dkt. No. 26 at 14.) They also characterize the conduct as no more than "a handful of comments and encounters," too minor or sporadic to be actionable under either the NYSHRL or the NYCHRL. (Dkt. No. 26 at 13–14). They note that several of the comments and encounters alleged fall outside the NYSHRL's and NYCHRL's three-year statute of limitations. (Dkt. No. 26 at 13.)

To state a hostile work environment claim under the NYSHRL, a plaintiff must allege conduct that: "(1) is objectively severe or pervasive—that is, [] creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks and citation omitted); *see also Torres v. Pisano*, 116 F.3d 625, 629 n.1 (2d Cir. 1997) ("[C]laims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII.").[2]  Although the standard for establishing an objectively hostile or abusive environment is "high," the Second Circuit has "repeatedly cautioned against setting the bar too high." *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003).  A hostile work environment "need not be unendurable or intolerable" but rather such that "a reasonable employee would find the conditions of her employment altered for the worse."  *Id.* (internal quotation marks, alteration, and citation omitted).

The standard under the NYCHRL is more permissive, omitting the requirement that the complained-of conduct be severe or pervasive:  "[T]o prevail on liability, the plaintiff need only show differential treatment — that she is treated 'less well' — because of a discriminatory intent." *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39 (1st Dep't 2009)).  A NYCHRL claim fails on the pleadings only when it raises a "truly insubstantial case in which

---

[2] Shortly before this case was filed, the New York legislature amended the NYSHRL to remove the requirement that harassment and abuse be objectively severe or pervasive.  The amendment is nonretroactive and therefore does not apply to Moazzaz's claims, which accrued before the amendment went into effect on October 19, 2019.  *See Sanderson v. Leg Apparel LLC*, No. 19-cv-8423, 2020 WL 7342742, at *5 n.4 (S.D.N.Y. Dec. 14, 2020) (citing *Golston-Green v. City of New York*, 123 N.Y.S.3d 656, 669 n.3 (2d Dep't 2020)).

[the] defendant's behavior cannot be said to fall within the broad range of conduct that falls between severe and pervasive on the one hand and a petty slight or trivial inconvenience on the other." *Hernandez v. Kaisman*, 103 A.D.3d 106, 114–15 (1st Dep't 2012) (internal quotation marks and citation omitted).

Both NYSHRL and NYCHRL claims are assessed by reference to "the totality of the circumstances." *Id*. at 115.  A court may consider, *inter alia*, "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humailiating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).  "[E]vidence that predates the commencement of the limitations period" may be "relevant to events during the period," *Fitzgerald v. Henderson*, 251 F.3d 345, 365 (2d Cir. 2001), and provide information regarding "the overall context" in which actionable statements were made and events occurred, *Hernandez*, 103 A.D.3d at 115.  Given the multiplicity of details that may bear on whether a NYSHRL or NYCHRL violation has occurred, "this is a fact-bound area of law" without a "precise test." *Torres v. New York Med. Hosp.*, No. 15-cv-1264, 2016 WL 3561705, at *9 (E.D.N.Y. Jan. 7, 2016) (citation omitted).  The NYSHRL, in particular, demands an "extraordinarily sensitive and comprehensive analysis . . . to assess a total set of workplace circumstances and determine whether a particular set of words and actions were enough to make that workplace a different, less tolerable environment for the victimized party." *Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 259 (S.D.N.Y. 2014).  It follows that claims of this sort, even when the allegations "are not so clearly outrageous to spell certain liability," *id*., are "particularly ill-suited to dismissal at the pleading stage," *Torres*, 2016 WL 3561705, at *9.

In support of her NYSHRL and NYCHRL claims, Moazzaz marshals three categories of supposed gender discrimination. First, she argues that her colleagues subjected her to pejoratives and criticisms that penalized her for being aggressive and encouraged her to conform to gender stereotypes. She is undoubtedly correct that the comments made by Hediger and Hijkoop in 2014 and 2015, referring to her as a "bitch" and instructing her to "be nicer," like a woman who "participates in community service activities and supports not-for-profit organizations," are gendered comments. *See Passananti v. Cook Cnty.*, 689 F.3d 655, 665 (7th Cir. 2012) ("[E]vidence that 'bitch' is 'sex based' for purposes of establishing gender-based harassment is not necessary."); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) ("[A]n employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender."). Hediger's previous comments, though outside the limitations period, "permit[] the inference that the remainder of his [purportedly] discriminatory conduct," *i.e.*, his 2018 decision to start calling Moazzaz the "little one" in conversations with senior leaders, "was also due to [her] sex." *Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir. 2001). The same applies to Hijkoop's references to Moazzaz's "sharp elbows" in 2017, in light of his failure to discipline Hediger for calling Moazzaz a "bitch," his time-barred gender-based criticism of Moazzaz, and his belief, publicly stated at a conference in 2014, that "women are too emotional" if they view "MetLife's 'ole boys' club' culture" as an impediment to their career advancement. (Dkt. No. 20 ¶ 118.)

Second, Moazzaz argues that she was subjected to gender-based reviews and investigations of her conduct. The Complaint alleges that Human Resources reviewed or investigated Moazzaz for being "too mean" twice, in succession, in 2018. Moazzaz describes the first review, which involved interviews and surveys of more than 20 of her colleagues, as

"humiliating," "fact-less," and "extremely damaging to [her] reputation." (Dkt. No. 20 ¶¶ 107, 110.) The reviewer, an external leadership coach retained by Podlogar, concluded and informed Moazzaz that she "need[ed] to choose between being pretty and being smart because men" — presumably the male colleagues interviewed — "[could not] put [her] in both boxes." (Dkt. No. 20 ¶ 111.) Just months after this intervention, Human Resources opened another investigation into Moazzaz's demeanor, based on a male subordinate's complaint about her "tone." As the Supreme Court observed in *Price Waterhouse v. Hopkins*, "[i]t takes no special training to discern sex stereotyping . . . if an employee's flawed 'interpersonal skills' can be corrected by a soft-hued suit or a new shade of lipstick." 490 U.S. at 256. The gendered nature of MetLife's investigations is further evidenced by the contrast between Human Resources's readiness to investigate Moazzaz and its alleged inaction with respect to men accused of using the word "bitch" and of discriminating against African American employees.

Third, Moazzaz argues that women, in general, faced day-to-day discrimination at MetLife. The Complaint lists five other female leaders who were "repeatedly told by male leaders that they were 'too aggressive'" or did not "fit into MetLife's 'culture.'" (Dkt. No. 20 ¶ 116.) It contextualizes these statements by noting that, in 2014, MetLife attendees of a women-only diversity conference identified "MetLife's 'ole boys' club' culture" as "the biggest impediment for career advancement for women at MetLife." (Dkt. No. 20 ¶ 118.) The Complaint also details a 2018 incident in which MetLife removed a mural from its common space after male leadership complained that the mural was "too feminine" and "excluded" men. (Dkt. No. 20 ¶¶ 130–34.) The mural, which had been installed at the request of Moazzaz, read:

> ADVANCING WOMEN:  Humankind is a bird with two wings;
> One is women, the other is men.  Only when both wings are equal
> can we soar.

(*Id.*)  The statements directed at Moazzaz's female colleagues and the removal of the mural are

plausibly pleaded as gendered conduct.

Taken together, Moazzaz's allegations are not "so inadequate as to warrant dismissal."

*Pryor*, 992 F. Supp. 2d at 258.  Defendants are correct that "trivial and isolated comments" (Dkt.

No. 26 at 13 n.8) cannot sustain a claim under the NYSHRL or NYCHRL, *see Alvarado v.*

*Nordstrom, Inc.*, 685 F. App'x 4, 8 (2d Cir. 2017).  Here, however, the comments alleged are not

trivial:  They were made by Human Resources personnel who controlled Moazzaz's

compensation, they were made not to Moazzaz in private but instead to her male colleagues, and

they may have impugned Moazzaz's ability to perform her job collaboratively.  *See Howley v.*

*Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000).  Nor are Moazzaz's grievances limited to a

handful of isolated comments.  Human Resources personnel allegedly subjected her to two

specious, gender-based investigations in 2018.  Although courts have previously treated

discriminatory investigations as "discrete acts" that are "not actionable as part of [a] plaintiff's

hostile work environment claim," *Beesen-Dwars v. Morris*, No. 06-cv-5593, 2007 WL 2128348,

at *7–8 (N.D. Ill. July 24, 2007) (rejecting argument that an employer's investigation of the

plaintiff's racist statements created a hostile work environment); *Dawson v. Rumsfeld*, No. 05-

cv-1270, 2006 WL 325867, at *1, 4 (E.D. Va. Feb. 8, 2006) (same), an employer cannot traffic

in gender stereotypes under the guise of conducting an investigation and then evade liability for

the resulting environment.  The investigations, which appear to have touched on Moazzaz's

physical appearance, humiliated Moazzaz and damaged her reputation at MetLife.  Moreover,

they created the Kafkaesque prospect that Moazzaz might be under perpetual investigation,

insofar as a new review could be triggered by something as amorphous as her "tone" or "too

short" emails.  Finally, Moazzaz alleges "harassment directed at [female] co-workers" and other

aspects of the "environment *as a whole*" that gesture toward the second-class status of women and aversion to gender equality at MetLife. *Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 190 (2d Cir. 2001) (emphasis in original); *see also Petrosino v. Bell Atlantic*, 385 F.3d 210, 214 (2d Cir. 2004) (holding that images in the workplace "that conveyed a low regard for women" supported the plaintiff's hostile work environment claim). Even though these conditions did not target Moazzaz specifically, under Second Circuit law they are still "relevant to [her] own claim of hostile work environment discrimination." *Leibovitz*, 252 F.3d at 190.

The Court recognizes that, based on the allegations, "this is not the most egregious of cases," but "it also is not a circumstance in which Defendants are obviously free from potential liability," particularly with respect to Moazzaz's NYCHRL claim. *Pryor*, 992 F. Supp. 2d at 259; *see also Gregory*, 243 F.3d at 695 ("[The Second Circuit] has found workplace situations discriminatory under a hostile work environment theory where the conduct at issue, though lacking any sexual component . . . , could, in context, reasonably be interpreted as having been taken on the basis of plaintiff's sex."). In *Harris v. Forklift Systems, Inc.*, the Supreme Court described a "discriminatorily abusive work environment" as one that "can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing their careers." 510 U.S. at 22. Moazzaz has alleged facts sufficient for the Court to conclude that gender discrimination at MetLife produced or was liable to produce these "tangible effects." *Id*. She has sufficiently pleaded her NYSHRL claim and pleaded facts beyond those necessary to sustain her NYCHRL claim.

C.      **Discriminatory Failure to Promote**

Moazzaz brings a discriminatory failure to promote claim under the NYSHRL and

NYCHRL.[3]   Although plaintiffs need not plead a prima facie case to survive a motion to dismiss,

*Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015), the elements of a

prima facie discriminatory failure to promote claim are that:

> (1) [the plaintiff] is a member of a protected class; (2) [the
> plaintiff] applied and was qualified for the job for which the
> employer was seeking applicants; (3) [the plaintiff] was rejected
> for the position; and (4) the position remained open and the
> employer continued to seek applicants having the plaintiff's
> qualifications.

*Petrosino*, 385 F.3d at 226.   At core, a plaintiff needs to show, and at the pleading stage "must at

least set forth enough factual allegations to plausibly support," *Mandala v. NTT Data, Inc.*, 975

F.3d 202, 209 (2d Cir. 2020), that she "was rejected [for promotion] under circumstances which

give rise to an inference of discrimination." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S.

248, 254 (1981).

Defendants argue that Moazzaz has pleaded "no facts to show an inference of

discrimination" and instead has pleaded facts indicating that she was denied a promotion based

on "the type of 'personality conflicts and disagreements with the management's style' that courts

do not find actionable."  (Dkt. No. 26 at 17 (citing *Grovesteen v. New York State Pub. Emps.*

*Fed'n, AFL-CIO*, 83 A.D.3d 1332, 1334 (3d Dep't 2011).)  But this is far from a fair reading of

---

[3] "Under the NYCHRL, there are not separate standards for 'discrimination' and 'harassment'
claims."  *Clarke v. InterContinental Hotels Grp., PLC*, No. 12-cv-2671, 2013 WL 2358596, at
*11 (S.D.N.Y. May 30, 2013).  As with her hostile work environment claim, Moazzaz need only
plead that she was treated "less well" to make out her discriminatory failure to promote claim
under the NYCHRL.  *Id.*  This is a "more liberal" standard, and "if a plaintiff satisfies [her]
burden under . . . [the] NYSHRL, then *a fortiori* [she] satisfies [her] burden under the . . .
NYCHRL framework."  *Holness*, 2011 WL 1085167, at *2.

the Complaint, let alone a reading that draws every reasonable inference in favor of Moazzaz, as the Court must in evaluating the motion to dismiss.

Moazzaz plausibly alleges that her gender was a motivating factor in the decision to deny her a promotion. *See Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1017 (2020) ("[A] Title VII plaintiff [and thus a NYSHRL and NYCHRL plaintiff] who shows that discrimination was even a motivating factor in the defendant's challenged employment decision is entitled to . . . relief.").  Podlogar's stated rationale for denying the promotion, that Moazzaz was "too mean, condescending and shouts," stands at odds with Moazzaz's high ranking in an employee engagement survey from the same year.  The rationale also stands at odds with Moazzaz's near-consistent receipt of the "highest possible performance ratings" (Dkt. No. 20 ¶ 3), which Podlogar downgraded that year by overriding an assessment from Moazzaz's manager.  Furthermore, Podlogar's instruction that Moazzaz be "nicer" to obtain a promotion echoes comments made by her predecessor as Chief Human Resources Officer, Hijkoop.  As discussed, the Complaint alleges numerous discriminatory statements made and viewpoints held by Hijkoop, who the Court reasonably infers influenced Podlogar's approach to the Chief Human Resources Officer role.

The Court might agree with Defendants that the rationale for denying the promotion regarded a gender-neutral personality conflict, were it not for Moazzaz's allegations that leaders in Human Resources referred to her using gendered pejoratives; that those leaders — including Podlogar — declined to discipline each other for doing so; that those leaders subjected Moazzaz to back-to-back investigations over whether she was "too mean" or had the wrong "tone," while simultaneously ignoring concrete grievances against male employees; and that those same leaders were responsible for employment actions.  *See Chambers*, 43 F.3d at 37.  But the

Complaint supplies all this context.  Accordingly, Moazzaz's discriminatory failure to promote claim survives the motion to dismiss.

### D.    Discriminatory Termination

Additionally, Moazzaz brings a discriminatory termination claim under the NYSHRL and NYCHRL.  This claim requires Moazzaz to plausibly plead "that [her] discharge occurred in circumstances giving rise to an inference of discrimination on the basis of [her] membership in [a protected] class." *Chambers*, 43 F.3d at 37.  The Second Circuit has described plaintiffs' threshold for making a prima facie case of discriminatory termination as "minimal." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) (internal quotation marks and citations omitted).  Notwithstanding the low bar for establishing a prima facie case, Defendants repeat their argument that Moazzaz "does not allege any fact [] which could give rise to a reasonable inference of discriminatory animus."  (Dkt. No. 26 at 16–17.)

Defendants correctly identify that the Complaint is sparse on details about the termination.  Moazzaz's only allegations are that she was terminated shortly after Khalaf succeeded Kandarian as CEO and that her termination was particularly abrupt.  (Dkt. No. 20 ¶¶ 148–52.)  In turn, Moazzaz's few allegations about Khalaf are that he was present at "talent review meetings" during which Moazzaz was referred to pejoratively, that he knew Moazzaz had drafted a candidate strategy for Lippert in his competing bid for the CEO role, and that he actively ignored Moazzaz and another woman who worked for Lippert after learning about the candidate strategy.  (Dkt. No. 20 ¶¶ 102, 141–47.)  The Complaint does not present MetLife's rationale for the termination or give any indication that Khalaf himself used gendered pejoratives or held antiquated views about women in the workplace.

Still, the Court can infer a discriminatory motive for Moazzaz's termination based on the allegations supporting the hostile work environment claim.  As *Chambers v. TRM Copy Centers*

*Corp.* explains, "an employer who discriminates is unlikely to leave a 'smoking gun' attesting to discriminatory intent." 43 F.3d at 37. This both forces and permits "victim[s] of discrimination . . . to rely on circumstantial evidence." *Id*. Following *Chambers*, courts in this circuit have liberally allowed discriminatory termination claims to advance, even when a plaintiff's allegations of discrimination have been too thin to sustain a hostile work environment claim. *See, e.g., Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 455–56 (S.D.N.Y. 2012) (dismissing the plaintiff's hostile work environment claim but declining to dismiss his discriminatory termination claim based on substantially identical allegations); *Szuszkiewicz v. JPMorgan Chase Bank*, 12 F. Supp. 3d 330, 341–43 (E.D.N.Y. 2014). *Shein v. New York City Department of Education*, No. 15-cv-4236, 2016 WL 676458 (S.D.N.Y. Feb. 18, 2016), which Defendants cite in their motion to dismiss (Dkt. No. 26 at 17), is not to the contrary. In *Shein*, the plaintiff never alleged that her employer so much as "uttered a slur." *Id*. at *5. It was implausible that the investigations against the plaintiff for "throwing a book at a student, . . . making inappropriate comments in front of a parent, and . . . ineffective teaching during a formal observation" were the product of discriminatory animus, rather than her own misconduct. *Id*. at *3–5. The allegations in *Shein* are not analogous to those in the Complaint.

If Defendants terminated Moazzaz for a legitimate, non-discriminatory reason, they may present evidence and arguments to that effect in a motion for summary judgment or at trial. *See Szuszkiewicz*, 12 F. Supp. 3d at 343 ("[T]he burden-shifting framework [for employment discrimination cases] is not applicable on a motion to dismiss."). At this stage, Moazzaz's allegations suffice, and her discriminatory termination claim may proceed to discovery.

### E.    Retaliation

Not all of Moazzaz's claims fare so well. Moazzaz brings retaliation claims under the NYSHRL and NYCHRL, with respect to Defendants' failure to promote her and their decision to

terminate her.  To prevail on these claims, Moazzaz would have to show "a causal connection" between her "protected activity," or complaints about unlawful discrimination, and these acts. *Nieblas-Love v. New York City Housing Auth.*, 165 F. Supp. 3d 51, 69–70 (S.D.N.Y. 2016) (citations omitted) (explaining the elements of retaliation claims under the NYSHRL and NYCHRL); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 313 (N.Y. 2004) (defining "protected activity").  Under the NYSHRL, Moazzaz would have to plausibly plead "but-for" causation, and under the NYCHRL, she would have to allege that retaliation was a "motivating factor" for Defendants' decisions.  *See King v. Block Inst., Inc.*, No. 17-cv-7318, 2020 WL 2523245, at *8 (E.D.N.Y. May 18, 2020); *Mihalik*, 715 F.3d at 116.  Defendants accurately assess that Moazzaz "has not alleged any facts[] which plausibly suggest that [her] complaints are linked to actionable retaliation."  (Dkt. No. 26 at 20.)

To support her retaliation claims, Moazzaz construes a broad array of her conduct as protected activity (Dkt. No. 29 at 20–23): (1) her November 2017 email to Lippert, complaining that it was "incredibly unfair" that she had not yet been promoted to a position announced in July 2017 (Dkt. No. 20 ¶ 96); (2) her June 2018 statement to Human Resources about her male subordinate attempting to lay off African American MetLife employees (Dkt. No. 20 ¶ 121); (3) her September 2018 candidate strategy, which "exposed many major gaps in diversity" at MetLife (Dkt. No. 20 ¶ 138); and (4) her several comments to Hediger about MetLife's lack of a "recruiting strategy aimed at increasing diversity" (Dkt. No. 20 ¶ 121).  Although protected activity need not occur via formal complaint, "informal complaints must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by [law]."  *Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012); *see also Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011) (holding that "generalized," non-specific grievances

do not constitute protected activity).  Because "lack of diversity alone is not actionable," and anti-discrimination laws do not require employers to maintain diversity programs, neither the candidate strategy nor Moazzaz's 2018 statements to Hediger constitute protected activity. *Fenner v. News Corp.*, No. 09-cv-9832, 2013 WL 6244156, at \*25 (S.D.N.Y. Dec. 2, 2013) (citing *Branch v. Sony Music Ent. Inc.*, No. 97-cv-9238, 2001 WL 228108, at \*6 (S.D.N.Y. Mar. 8, 2001)).  Moazzaz's November 2017 complaint and June 2018 statement plausibly constitute protected activity, the former squeaking by only because "Kandarian was advised that MetLife would be asking for a lawsuit" if Moazzaz were not promoted.  (Dkt. No. 20 ¶ 9.)

Irrespective of how one construes the November 2017 complaint, Moazzaz has not alleged a causal relationship between it and MetLife's decision not to promote her three months later.  "Temporal proximity is an important, though not necessarily determinative, piece of evidence concerning the motivating factors behind terminating an employee," and when a plaintiff "relies solely on temporal proximity to prove causation, the protected activity and the [purportedly retaliatory act] must be very close" in time.  *Leshinsky v. Telvent GIT, S.A.*, 942 F. Supp. 2d 432, 450 (S.D.N.Y. 2013) (internal quotation marks and citations omitted).  A three-month gap, standing on its own, is ordinarily insufficiently close to show causation, and "[c]laims of retaliation are routinely dismissed when as few as three months elapse between the protected [] activity and the alleged act of retaliation."  *Nicastro v. Runyon*, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) (collecting cases); *see also King*, 2020 WL 2523245, at \*7–8 (applying the same temporal analysis to retaliation claims under the NYSHRL and NYCHRL).  Moazzaz does not allege that the nature of her assignments or her relationship with any MetLife leader changed in the wake of her email to Lippert.  *Cf. Leshinsky*, 942 F. Supp. 2d 432, 450 (holding that a five-month gap was sufficiently close because the plaintiff "was marginalized directly after his

[protected activity]"); *Barker v. UBS AG*, 888 F. Supp. 2d 291, 301 (D. Conn. 2012) (same). Indeed, it would be a stretch to consider the decision not to promote Moazzaz as anything other than the status quo, when the gravamen of Moazzaz's complaint was that she had not yet been promoted. *See Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 129 (1st Dep't 2012) ("[A]n employer's continuation of a course of conduct that had begun before the employee complained does not constitute retaliation because, in that situation, there is no causal connection between the employee's protected activity and the employer's challenged conduct."). Moazzaz does not plausibly plead that her complaint to Lippert affected her likelihood of promotion.

The connection between Moazzaz's June 2018 statement about her male subordinate and her termination eleven months later is even more tenuous. Moazzaz cites *Mahoney v. KeySpan Corp.*, No. 04-cv-554, 2007 WL 805813, at *6 (E.D.N.Y. Mar. 12, 2007), for the proposition that a thirteen-month gap between protected activity and a purportedly retaliatory act "constitutes temporal proximity" (Dkt. No. 29 at 20–21). She neglects to mention that in *Mahoney*, unlike her case, the plaintiff "began to experience [social] retaliation almost immediately" after his protected activity. 2007 WL 805813, at *6. Although Moazzaz alleges that she experienced social isolation at MetLife, this occurred after Kandarian and Khalaf obtained her September 2018 candidate strategy for Lippert, not in June 2018 when she informed Human Resources that her male subordinate was engaging in racial discrimination. Accordingly, Moazzaz has not plausibly pleaded retaliation under the NYSHRL or NYCHRL, and those claims are dismissed.

## F.    Individual Liability

Finally, Moazzaz's claims are brought not only against MetLife but also against Khalaf, Kandarian, Podlogar, Hediger, and Hijkoop. Defendants dispute the appropriateness of individual liability, arguing that Khalaf, Kandarian, Hediger, and Hijkoop were insufficiently involved in the discriminatory conduct alleged. Defendants' argument is unpersuasive.

Under the Equal Pay Act and its state analogue, an individual can bear liability as an "employer" based on whether the individual "possess[es] control over a company's actual 'operations' in a manner that relates to a plaintiff's employment," such as by determining "workplace conditions and operations, personnel, or compensation." *Irizarry v. Catsimatidis*, 772 F. 3d 99, 109 (2d Cir. 2013); *Bonner v. Guccione*, No. 94-cv-7735, 1997 WL 362311, at *13 (S.D.N.Y. July 1, 1997) (concluding that individual liability exists for Equal Pay Act violations); *see also* 29 U.S.C. § 203(d).  The Second Circuit has held that "[n]othing . . . requires an individual to have been personally complicit in [the] violations; the broad remedial purposes behind the statute counsel against such a requirement."  *Id*. at 110.  The Complaint's Equal Pay Act and state claims against Khalaf, Kandarian, and Podlogar survive under this standard. Khalaf, Kandarian, and Podlogar are each plausibly pleaded to have had substantial authority over personnel and compensation matters.  *Fayson v. Kaleida Health, Inc.*, No. , 2002 WL 31194559, at *4–5 (W.D.N.Y. Sept. 18, 2002) (considering whether a defendant had "final decision-making authority" or just "the authority to . . . carry out personnel decisions" made by others).  Specifically, the Court reasonably infers that Khalaf directed Moazzaz's termination. Kandarian, of course, preceded Khalaf as CEO and would have held the same authority.  The Complaint explicitly alleges that Podlogar had authority over promotions and bonus compensation for employees including Moazzaz.

Moazzaz brings her NYSHRL and NYCHRL claims against all Defendants, including Hediger and Hijkoop.  As the New York Court of Appeals recently held in *Margaret Doe v. Bloomberg, L.P., et al.*, "employees of [a business] entity are not employers" under the NYSHRL and NYCHRL and are therefore not subject to vicarious liability.  _ N.E.3d _, 2021 WL 496608, at *4 (Feb. 11, 2021).  Individuals "may incur liability only for their own

discriminatory conduct, for aiding and abetting such conduct by others, or for retaliation against protected conduct." *Id.* (citation omitted). A wide range of conduct, however, may constitute participation in unlawful discrimination. *See Lewis v. Triborough Bridge & Tunnel Auth.*, 77 F. Supp. 2d 376, 384 (S.D.N.Y. 1999). And at the pleading stage, an individual defendant's failure to investigate a complaint of unlawful discrimination, even if not actionable "in and of itself," *id.* at 383, gives rise to the inference that the defendant "encouraged, condoned or approved" the offending conduct, aiding and abetting it, *Hicks v. IBM*, 44 F. Sup. 2d 593, 600 (S.D.N.Y. 1999). The Complaint alleges that each Khalaf, Kandarian, Podlogar, Hediger, and Hijkoop actively participated in or failed to investigate gender discrimination. The extent of, say, Kandarian's involvement in the decision not to promote Moazzaz may in fact be limited or nonexistent, but the allegations that he knew of her non-promotion and did nothing suffice at this stage. The claims against all Defendants may proceed to discovery.

## IV.   Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

Defendants shall file an answer to the remaining claims within 21 days after the date of this Opinion and Order.

The Clerk of Court is directed to close the motion at Docket Number 26.

SO ORDERED.

Dated: March 4, 2021
        New York, New York

J. PAUL OETKEN
United States District Judge