UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MONA MOAZZAZ,

                              Plaintiff,

                -v-

METLIFE, INC, *et al*.,

                              Defendants.

19-CV-10531 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Mona Moazzaz brings this action against MetLife Group, Inc. ("MetLife"), Michel Khalaf, Steven Kandarian, Frans Hijkoop, Susan Podlogar, and Gary Hediger, asserting claims under the Equal Pay Act (EPA), 29 U.S.C. §§ 206, *et seq*., New York Equal Pay Law (NYEPL), New York Labor Law § 194(1), the New York State Human Rights Law (NYSHRL), N.Y. Executive Law §§ 290, *et seq*., and the New York City Human Rights Law (NYCHRL), N.Y.C. Admin. Code §§ 8-101, *et seq*.  Before the Court is Defendants' motion for summary judgment. For the reasons that follow, the motion is granted in part and denied in part.

I.      **Background**

   A.      **Factual Background**

The following facts are drawn from Defendants' Rule 56.1 Statement (ECF No. 94 ("Defs.' SOF")) and Plaintiff's Response to Defendants' Rule 56.1 Statement (ECF No. 113 ("Pl.'s SOF Opp.")).  The facts recited here are undisputed unless otherwise noted, and they are construed in the light most favorable to Plaintiff.

MetLife is an insurance and financial services company based in New York.  In February 2012, MetLife hired Moazzaz as a Vice President and Chief of Staff for Martin Lippert, the head

of Global Technology and Operations (GTO).  (Defs.' SOF ¶¶ 6-7.)  Moazzaz worked at MetLife

until her termination effective July 31, 2019.  (*Id.* ¶ 66.)

Defendant Khalaf is MetLife's current Chief Executive Officer (CEO).  Prior to assuming

the role on May 1, 2019, Khalaf was MetLife's Head of Europe, the Middle East, and Africa.

(*Id.* ¶ 1.)  Defendant Kandarian was Khalaf's predecessor as MetLife CEO from 2011 to 2019.

(*Id.* ¶ 2.)  Defendant Hijkoop served as MetLife's Chief Human Resources Officer (CHRO) from

August 2011 until his retirement effective December 31, 2016.  (*Id.* ¶ 3.)  Defendant Podolgar

has been MetLife's CHRO since July 10, 2017.  (*Id.* ¶ 4.)  Defendant Hediger was a Human

Resources (HR) Business Partner for GTO from March 2014 until his departure from MetLife in

December 2020.  (*Id.* ¶ 5.)

MetLife uses a "Global Grading System" (GGS) to evaluate and assign numerical grades

to jobs.  The GGS was developed by a third party.  In MetLife's system, Grades 15 and 16

correspond to the title of Vice President (VP), Grades 17 and 18 correspond to the title of Senior

Vice President (SVP), and Grade 19 corresponds to the title of Executive Vice President (EVP).

(*Id.* ¶ 8.)  Although the Executive Compensation Group administers the process that assigns

grades to individual roles (*id.* ¶ 10), Moazzaz alleges that whether MetLife ultimately promoted

an employee and raised their grade was a discretionary decision in which the CHRO played a

substantial role (Pl.'s SOF Opp. ¶ 10).

In September 2014, MetLife promoted Moazzaz to SVP at Grade 17, with the title of

Chief Administrative Officer (CAO) for GTO.  While continuing to serve as Lippert's Chief of

Staff, Moazzaz assumed additional responsibilities, including managing the preparation for

MetLife's digital strategy.  (Defs.' SOF ¶ 14.)  MetLife ultimately hired Greg Baxter, who,

according to MetLife, became responsible for building MetLife's digital organization and

implementing a digital strategy.  (*Id*. ¶ 15.)  Moazzaz denies that Baxter was solely responsible for building MetLife's digital organization and alleges that she was responsible for overseeing the creation of MetLife's digital strategy and continued to perform work to implement it after Baxter's hiring.  (Pl.'s SOF Opp. ¶ 15.)

In 2017, MetLife expanded Moazzaz's responsibilities to include oversight of MetLife's Real Estate, Corporate Security, and Global Enterprise Management functions.  (Defs.' SOF ¶ 17.)  At the same time, Lippert announced the expansion of the roles of two other GTO executives: James O'Donnell was promoted from Chief Technology Officer to Head of Global Technology, and Kristine Poznanski was promoted from Head of U.S. Customer Solutions Centers to Head of Global Customer Solutions.  (*Id*. ¶ 18.)  MetLife also announced the retirement of Joseph Sprouls, an EVP who had been the Head of Real Estate.  (*Id*. ¶ 19.)  According to MetLife, Sprouls was replaced by a former subordinate, Timothy O'Brien (*id*.), but Moazzaz alleges that she, rather than O'Brien, was put in charge of Corporate Real Estate (Pl.'s SOF Opp. ¶ 19).

In July 2017, Hediger submitted a memo to the Executive Compensation group requesting an increase in O'Donnell's role's grade from 19 to 20; Poznanski's role's grade from 18 to 19; and Moazzaz's role's grade from 17 to 18.  Although Sprouls' role had been a Grade 19 position, Hediger recommended downgrading the role to Grade 17 because MetLife "completed the majority of the global real estate agenda and [did not] need an EVP in the role."  (Defs.' SOF ¶ 20.)

According to MetLife, the company's compensation team used a detailed description of Moazzaz's expanded role to grade the position on a series of factors as part of the GGS process. This grading process recommended grades matching those in Hediger's memo, including a

Grade 18 for Moazzaz's position. (*Id*. ¶ 21.) Moazzaz disputes that her grade was solely the result of the information contained in the job description. Instead, Moazzaz contends that much of the information used to grade Moazzaz's role came from conversations with Hediger, who was HR Business Partner for GTO, and his descriptions of her job responsibilities. Moazzaz also contends that the Global Compensation Team determined that her job responsibilities could support a Grade of 19 but was overruled by Podlogar, who insisted the role remain at Grade 18. (Pl.'s SOF Opp. ¶ 21.) Moazzaz further alleges that there is evidence that members of the Global Compensation Team understood how to manipulate the various inputs into the GGS so that a job would be graded at a particular level. (*Id*. ¶ 22.)

Podlogar did not learn about the recommended Grade 18 for Moazzaz's expanded role until September 2017, when Lippert approached her with his disagreement with the grade. Podlogar asked Lippert to provide an updated job description for the role so Compensation could confirm its grading process. (Defs.' SOF ¶ 24.) MetLife alleges that Compensation, using the updated description that Moazzaz helped create, confirmed the Grade 18. (*Id*. ¶ 25.) Moazzaz argues, however, that Compensation rejected or discounted much of Lippert's input based on their own skepticism of the job description without actually confirming Moazzaz's day-to-day responsibilities. (Pls.' SOF Opp. ¶ 25.)

According to MetLife, Podlogar ultimately informed Lippert that Moazzaz's role could be reevaluated for an increase to Grade 19 in the future. (Defs.' SOF ¶ 26.) Moazzaz alleges that Podlogar told Lippert that Moazzaz was not promoted because she was "too mean" and because she was "condescending and shouts." Moazzaz further contends that Podlogar told Lippert that if Mozzaz "is nicer" that Podlogar would reconsider the promotion decision after twelve months. (Pl.'s SOF Opp. ¶ 26.)

In 2017, MetLife Employee Relations (ER) investigated Moazzaz after receiving a complaint from one of Moazzaz's indirect reports that she forced his manager to place him on a Performance Improvement Plan and otherwise treated her reports poorly.  (Defs.' SOF ¶ 28.) MetLife alleges that this individual also claimed that Moazzaz blocked both a promotion and an internal transfer offer.  (*Id*. ¶ 29.)

According to MetLife, two members of its ER team interviewed roughly a dozen current and former employees who worked for or with Moazzaz.  According to a summary of the investigation prepared by Tracey Tate-Gowins, an Assistant Vice President in ER, numerous witnesses reported abusive behavior from Moazzaz.  According to MetLife, employees described Moazzaz using words like "demeaning, unprofessional, antagonistic, manipulative, paranoid, creator of an atmosphere of fear, and an abuser of power."  (*Id*. ¶ 32.)  Moazzaz disputes all of the contents of the investigative notes and statements purportedly made to investigators as hearsay.  (Pl.'s SOF Opp. ¶¶ 32-38.)  It is undisputed that when Tate-Gowins interviewed Moazzaz as part of the investigation, Moazzaz questioned the veracity of the allegations and stated that the interviewees must have been "poor performers."  (Defs.' SOF ¶ 41.)

After the conclusion of the investigation, in late November 2017, Tate-Gowins prepared a final report for Podlogar and recommended that Moazzaz receive a final warning, undergo executive coaching, and/or have her organization subject to a "pulse" check after a few months. (*Id*. ¶ 44.)  After Podlogar presented these recommendations to Lippert, Lippert declined to issue a final warning but agreed to provide Moazzaz with executive coaching.  (*Id*. ¶ 46.)  According to MetLife, following the investigation, Podlogar told Lippert that she did not believe Moazzaz should receive a "Far Exceeds Expectations" rating for 2017 and instead believed she deserved the lower rating of "Meets All or Most Expectations."  (*Id*. ¶ 50.)  Moazaaz disputes this account

and alleges that Podlogar told Lippert that she was reducing Moazzaz's performance rating because she was too "mean."  (Pl.'s SOF Opp. ¶ 51.)  It is undisputed that Lippert believed Moazzaz still deserved that "Far Exceeds Expectations" rating.  (Defs.' SOF ¶ 51.)  Moazzaz received a "Meets All or Most Expectations" rating for 2017.

After this investigation, another of Moazzaz's subordinates made a complaint about Moazzaz.  (*Id*. ¶ 53.)  According to MetLife, this individual complained about Moazzaz's management style and Tate-Gowins determined that the complaint did not warrant a formal investigation.  (*Id*. ¶ 54.)  According to Moazzaz, Tate-Gowins functionally took all the steps necessary for a formal investigation, including reviewing the complaint, speaking with both the individual and Moazzaz, and reviewing documents from the individual.  (Pl.'s SOF Opp. ¶ 54.)

In early 2019, MetLife announced that Khalaf would be succeeding Kandarian as the next CEO, effective May 1, 2019.  Shortly after the announcement, Moazzaz learned that Lippert, who was allegedly the other candidate to succeed Kandarian, would be leaving the company and that James O'Donnell would become the Interim Head of GTO.  (Defs.' SOF ¶¶ 57-58.)  According to MetLife, following Khalaf's selection and Lippert's departure, the company undertook a realignment of various roles and functions that led to O'Donnell's decision to eliminate Moazzaz's role.  (*Id*. ¶ 58.)  Moazzaz disputes the characterization of the decision as a job elimination and instead describes it as a redistribution of her duties to other employees.  (Pl.'s SOF Opp. ¶ 58.)  On May 13, 2019, MetLife notified Moazzaz that her role was being eliminated effective July 31, 2019.  (Defs. SOF ¶ 66.)

In parallel with these events, Moazzaz claims that she experienced gender discrimination and a hostile work environment at MetLife.  It is undisputed that Hediger, on one occasion, referred to Moazzaz as "the little one" and may have referred to her as "commander."  (*Id*. ¶ 74.)

The parties dispute whether Hediger also used to term "commander" several times to refer to male colleagues.  (Pl.'s SOF Opp. ¶ 75.)  In 2014, a subordinate named Adnan Sulejmanpasic told Moazzaz that Hediger had called her a "bitch."  (Defs' SOF ¶ 76.)  According to MetLife, Hediger, in fact, told Sulejmanpasic either that he "just got bitch-slapped by [Moazzaz]" or that "[Moazzaz] ha[d] been bitch-slapping [him]."  (*Id*. ¶ 77.)  According to Moazzaz, Hediger admitted to both Lippert and Moazzaz that he had referred to Moazzaz as a "bitch."  (Pl.'s SOF Opp. ¶ 77.)  Lippert also heard MetLife's former Head of Asia, Christopher Townsend, refer to Moazzaz as having sharp elbows.  Lippert also believes he recalls Hijkoop referring to Moazzaz as having "sharp elbows" during a Talent Review meeting.  (Defs.' SOF ¶ 79.)  The parties dispute whether Lippert believes that term is gender neutral.  (Pl.'s SOF Opp. ¶ 79.)

Moazzaz also alleges other specific instances of gender discrimination and mistreatment of women by male colleagues at MetLife, which she characterizes as having an "old boys' network."  (*See id.* ¶¶ 81-85, 296.)  Moazzaz complained to Lippert in an email in November 2017 that the Executive Group treated female employees differently from male employees.  (*Id.* ¶ 304.)  According to Moazzaz, she reported the comments about "sharp elbows," being called a "bitch," a "commander," and "little one" to Tate-Gowins in ER, who did not follow up on her complaints.  (*Id.* ¶¶ 305-321.)

### B.    Procedural History

Moazzaz filed this action on November 13, 2019, asserting claims under the Equal Pay Act, New York Labor Law § 194(1), the New York State Human Rights Law (NYSHRL), and the New York City Human Rights Law (NYCHRL).  (ECF No. 1.)  She later filed a charge of discrimination with the Equal Employment Opportunity Commission and an amended complaint. (ECF No. 20.)  On April 3, 2020, Defendants moved to dismiss the Complaint.  (ECF No. 26.)

On March 4, 2021, the Court dismissed Moazzaz's retaliation claims but denied the motion to dismiss as to the other claims.  (ECF No. 36.)

On March 23, 2023, Defendants filed a motion for summary judgment.  (ECF No. 92.) Moazzaz filed her opposition on May 19, 2023 (ECF No. 111), and Defendants filed their reply on June 16, 2023.  (ECF No. 118.)

## II.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  Defendants, as the moving party, have "the burden of demonstrating that no genuine issue of material fact exists."  *EMA Fin., LLC v. Flitways Tech., Inc.*, No. 20-CV-324, 2022 WL 1910078, at *2 (S.D.N.Y. June 3, 2022) (citing *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002)).  In deciding whether such a showing has been made, here, the Court resolves all ambiguities and draws all permissible inferences in favor of Plaintiff, against whom summary judgment is sought.  *Friend v. Gasparino*, 61 F.4th 77, 84 (2d Cir. 2023).

## III.    Discussion

### A.    Disparate-Pay Claims

Moazzaz brings her disparate-pay claims under the EPA, New York Labor Law § 194(1), the NYSHRL, and the NYCHRL.  The EPA prohibits an employer from "discriminat[ing] . . . on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which

requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1).  New York Labor Law § 194(1) prohibits disparate pay because of membership in a protected class for "substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions." N.Y. Lab. Law § 194(1).  The NYSHRL prohibits discrimination in pay "because of an individual's . . . sex."  N.Y. Exec. L. § 296(1)(a).  The NYCHRL makes unlawful disparate pay "because of the actual or perceived . . . gender . . . of any person."  N.Y.C. Admin. Code § 8-107(1)(a).

Although courts in this Circuit have often evaluated claims of violations of the EPA and New York Labor Law § 194(1) "under the same standard," *see, e.g.*, *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 570 (S.D.N.Y. 2012) (internal citations omitted), the Second Circuit recently clarified that claims under the federal and state equal pay laws must be assessed separately, *see Eisenhauer v. Culinary Inst. of Am*., 84 F.4th 507, 523 n.83, 525-26 (2d Cir. 2023).  Accordingly, the Court first addresses Moazzaz's federal claim.  To establish a *prima facie* EPA claim, a plaintiff must demonstrate: "i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions." *Id*. at 523 (quoting *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999)).  For the second element, "a plaintiff need not demonstrate that her job is identical to a higher paid position, but only must show that the two positions are substantially equal in skill, effort, and responsibility." *Lavin-McEleney v. Marist Coll*., 239 F.3d 476, 480 (2d Cir. 2001) (internal quotation marks, internal citation, and alteration omitted).

If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to show that the pay disparity is justified by one of the EPA's affirmative defenses: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1); *see Eisenhauer*, 84 F.4th at 523. "To establish the EPA's 'factor other than sex' defense, a defendant must prove only that the pay disparity in question results from a differential based on any factor except for sex." *Id*. at 523-24. That factor need not be "job-related." *Id*. at 516-17. However, "[i]f the pay disparity results from the employer's job-classification system, the job-classification system must also serve a 'legitimate business-related' purpose." *Id*. at 513 n.3 (quoting *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 525 (2d Cir. 1992)). If the employer satisfies this burden, the plaintiff may offer evidence showing that the affirmative defense is a pretext for sex discrimination. *Belfi v. Prendergast*, 191 F.3d 129, 136 (2d Cir. 1999).

Beginning with the first element of the *prima facie* case, MetLife does not dispute that it paid Moazzaz less than certain male comparators. It also does not appear to dispute the third element—that the jobs were performed under similar working conditions. Instead, MetLife attacks the second element of Moazzaz's *prima facie* case and argues that she has not shown that the male comparators' jobs were "substantially equal" to hers. Whether different positions are "substantially equivalent" for the purposes of the Equal Pay Act is usually a question of fact to be resolved by a jury. *Lavin-McEleney*, 239 F.3d at 480. However, "two positions may be so different such that no reasonable juror could conclude that they are 'substantially equal.'" *Drury v. Waterfront Media Inc.*, No. 05-CV-10464, 2007 WL 737486, at *3 (S.D.N.Y. March 8, 2007). Although MetLife has presented some evidence that Moazzaz's role was not substantially equal

to that of one of her comparators, Greg Baxter, MetLife has offered insufficient evidence to defeat Moazzaz's case based on her other comparators: Chris Smith, Steve Weinreb, Toby Brown, and Ed Spehar.  Based on the record evidence, a jury could reasonably infer that Moazzaz's role and those of one or more of her comparators entailed substantially equal responsibility.  Accordingly, the Court concludes that Moazzaz has established a *prima face* EPA case sufficient to survive summary judgment.

The Court also concludes that Moazzaz has established triable issues of fact regarding MetLife's asserted affirmative defense and the question of pretext.  MetLife argues that any pay disparity resulted from bona fide factors other than sex—specifically, MetLife's gender-neutral GGS.  MetLife argues that Moazzaz's pay disparity with Baxter was justified by Baxter's higher grade and that his higher grade was justified by his greater experience.  However, Moazzaz has offered evidence showing that Baxter's CDO position was graded a year before Baxter took the role—demonstrating that Baxter's experience did not influence the grading of the role.  Moazzaz has also shown that under MetLife's policies, the GGS is supposed to assess a position based on its job responsibilities only, irrespective of the qualifications and experiences of the individual in the role.  Furthermore, Moazzaz has presented evidence that individual HR employees have substantial discretion and leeway in influencing the outputs of the GGS.  She has also presented evidence—namely, Hediger's remark—from which a jury could infer that an HR official with significant input in the grading of Moazzaz's role had gender-biased views toward Moazzaz.  Based on the record evidence, a reasonable jury could find that the pay disparity was based on Moazzaz's sex and that MetLife's reliance on the GGS was pretext for discrimination.  Accordingly, Moazzaz's EPA claim survives MetLife's summary judgment motion.

The Court now turns to Moazzaz's pay disparity claim under New York Labor Law New York Labor Law § 194(1).  To prevail, Moazzaz must show that she received less pay than her comparators for "substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions."  N.Y. Lab. Law § 194(1).  Based on the evidence of the substantial similarity between Moazzaz's job and those of her male comparators discussed above, the Court concludes that Moazzaz has established a *prima facie* case under § 194(1).  An employer may assert the affirmative defense that a pay disparity was based upon "a bona fide factor other than [sex]"—but that factor must be "job-related with respect to the position in question and shall be consistent with business necessity."  N.Y. Lab. Law § 194(1)(iv).  Based on the evidence already discussed related to MetLife's GGS and the relative grading of Moazzaz and her comparators, the Court concludes that MetLife has failed to show that there is no genuine factual dispute that the pay disparity was based upon a job-related factor other than sex.  Accordingly, Moazzaz's pay-disparity claim under the New York Labor Law also survives summary judgment.

The Court next addresses Moazzaz's NYSHRL pay disparity claim.  Because Moazzaz's claim accrued prior to the August 12, 2019 amendment of the NYSHRL, the Court applies the pre-amendment version of the law.  *See Matthew v. Texas Comptroller of Pub. Accts.*, No. 21-CV-5337, 2022 WL 4626511, at *10-11 (S.D.N.Y. Sept. 30, 2022).  Claims under the pre-amendment NYSHRL are governed by the same standard as federal law claims under Title VII.  *See Summa v. Hofstra Univ.*, 708 F.3d 115, 123-24 (2d Cir. 2013).   In order to establish a *prima facie* case under the pre-amendment NYSHRL, Moazzaz must show that her employer discriminated against her with respect to her compensation because of her sex.  *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 110 (2d Cir. 2019).  This requirement includes a showing of

discriminatory animus or intent. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1312-13 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742 (1998). Although the NYSHRL does not require that a plaintiff show that "she performed equal work for unequal pay," establishing an EPA violation is "one way" to state a *prima facie* NYSHRL case. *Lenzi*, 944 F.3d at 110. Based on the analysis of Moazzaz's EPA claim, the Court determines that Moazzaz has established a *prima facie* case under the NYSHRL. The record evidence regarding Moazzaz's disparate treatment compared with her male comparators and the potential for discretionary inputs into MetLife's GGS, construed in the light most favorable to Moazzaz, also supports an inference of discriminatory intent. *See Syeed v. Bloomberg L.P.*, 568 F. Supp. 3d 314, 321 (S.D.N.Y. 2021). The Court applies the analysis of Moazzaz's EPA claim also to conclude that Moazzaz has created triable issues of fact regarding MetLife's asserted affirmative defense and the question of pretext. Based on the record evidence, a reasonable jury could conclude that gender-based discrimination was at least one of the motivating factors for Moazzaz's disparate pay and that MetLife's use of GGS was not a bona fide factor other than sex but rather pretext for discrimination. This is sufficient to preclude summary judgment on the NYSHRL claim.

Moazzaz's NYCHRL claim is evaluated under a "more liberal" standard than the federal or pre-amendment NYSHRL standards. *See Romero v. St. Vincent's Service, Inc.*, No. 22-1476-CV, 2023 WL 3477161, at *2 (2d Cir. May 16, 2023) (summary order) (citing *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). Under the NYCHRL, "summary judgment is appropriate if 'the record establishes as a matter of law' that discrimination . . . 'play[ed] no role' in the defendant's action." *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 76 (2d Cir. 2015) (quoting *Mihalik*, 715 at 110 n.8). Because the

NYCHRL standard parallels the EPA and NYSHRL in some respects and is more generous to plaintiffs in others, Moazzaz's city claim for disparate pay survives summary judgment for the same reasons and *a fortiorari*.

### B.      Hostile Work Environment Claims

Alongside her pay discrimination claims, Moazzaz brings hostile work environment claims under the NYSHRL and the NYCHRL.  Because Moazzaz's claims accrued prior to her termination effective July 31, 2019 (*see* Pl.'s SOF Opp ¶ 66), the Court applies the version of the NYSHRL in effect before two amendments relevant to her claims became effective on August 12, 2019, and October 11, 2019, respectively.  *See Matthew*, 2022 WL 4626511, at *10-11.

Claims under the pre-amendment NYSHRL are governed by the Title VII standard.  *See Summa*, 708 F.3d at 123-24.  To prevail on her NYSHRL hostile work environment claim, Moazzaz therefore is required to prove conduct that: "(1) is objectively severe or pervasive—that is, [ ] creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex."  *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks and citation omitted).  Moazzaz must also show "that a specific basis exists for imputing the objectionable conduct to the employer."  *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).

Hostile work environment claims are assessed by reference to the "totality of the circumstances."  *Id*. at 378.  A court may consider, *inter alia*, "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's work performance."  *Harris v. Forklift Sys*., *Inc*., 510 U.S. 17, 23 (1993).  However, "[i]n assessing the 'totality of the circumstances' . . . , a fact-finder may consider only abusive conduct proven to be

14

'based on sex.'  This may be proven by harassment in such sex-specific and derogatory terms as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace, or by offering some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory."  *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117-18 (2d Cir. 2010) (internal citations, quotation marks, and alterations omitted).  A plaintiff may also "rely on incidents of sex-based abuse to show that other ostensibly sex-neutral conduct was, in fact, sex-based."  *Id*. at 118.

Applying these standards here, the Court concludes that Moazzaz fails to raise a genuine dispute of material fact as to her NYSHRL hostile environment claim.  The record evidence shows one instance of gender-based conduct that could support a hostile environment claim: a 2014 conversation in which Hediger either told a subordinate that he "just got bitch-slapped by [Moazzaz]" or referred to Moazzaz as a "bitch."  (Pl.'s SOF Opp ¶¶ 77-78.)  Hediger's remark is time-barred by the NYSHRL, which imposes a three-year limitations period.  N.Y. C.P.L.R. § 214(2).  However, a hostile environment claim "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."  *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 (2002).

The record here, however, does not show evidence of other acts of gender-based harassment within the limitations period, let alone "a continuous practice and policy of discrimination" that would justify an exception to the statute of limitations under the continuing violation doctrine.  *See Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (internal citations omitted); *see also King v. Aramark Services Inc.*, No. 22-1237, -- F.4th --, 2024 WL 1188985,  at *9 (2d Cir. Mar. 20, 2024) (holding that the continuing violation doctrine applies when "at least one act furthering the discriminatory pattern or practice of hostile treatment

occurred within the limitations period").   Moazzaz has not adduced sufficient evidence to raise a

genuine dispute over whether any of the other acts she cites were gender-motivated: the remarks

by Hijkoop and other MetLife employees, MetLife's investigations into her conduct, and the

company's action or inaction in response to her own complaints.   Nor has she presented

sufficient evidence to link Hediger's stray remark to the other alleged conduct or to her other

claims.   The evidence does not support a finding that gender-based comments or conduct was

"severe or pervasive" or that it "unreasonably interfered with [Moazzaz's] work performance."

Moazzaz has failed to raise a triable issue of fact as to whether there was a continuous practice of

discrimination, or whether ostensibly gender-neutral conduct was, in fact, gender-motivated.

Based on the totality of the circumstances as established in the record, the Court determines that

no rational jury could conclude that the timely acts were anything other than gender-neutral

responses to Moazzaz's personality, management style, and conduct during her tenure at

MetLife.   Because Moazzaz has failed to present evidence, aside from Hediger's time-barred

remark, from which a rational jury could determine that gender played any role in how she was

treated at MetLife, MetLife is entitled to summary judgment on the NYSHRL hostile

environment claim.

The Court now turns to Moazzaz's claim under the NYCHRL, which is more generous to

plaintiffs than the pre-amendment NYSHRL.   Under the NYCHRL, courts must "construe its

provisions broadly in favor of a plaintiff—*i.e.*, to analyze whether a plaintiff is treated 'less well'

because of a discriminatory intent." *Nguedi v. Fed. Reserve Bank of N.Y.*, 813 F. App'x 616,

617-18 (2d Cir. 2020) (citation omitted).   That is to say, Moazzaz must show that she was treated

less well than other employees at least in part because of her gender. *Williams v. N.Y.C. Hous.*

*Auth.*, 61 F.4th 55, 69 (2d Cir. 2023); *Alvarado v. Nordstrom, Inc.*, 685 F. App'x 4, 8 (2d Cir.

2017) (citing *Mihalik*, 715 F.3d at 110). "The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that discrimination played no role in its actions." *Mihalik*, 715 F.3d at 110 n.8 (cleaned up).

Even under NYCHRL's more liberal standard, Moazzaz's hostile environment claim fails. For the reasons discussed above, Moazzaz has failed to present evidence from which a rational jury could determine that gender played a role in how she was treated, aside from Hediger's 2014 remark, which is also time-barred under city law. *See* N.Y.C. Admin. Code § 8-502(d). Moazzaz has adduced insufficient evidence to support the inference that any of the other alleged acts were gender-motivated. And, as also discussed above, Moazzaz has failed to establish a triable issue of fact as to whether Hediger's comment was part of a continuous pattern or practice of discrimination. Accordingly, MetLife is also entitled to summary judgment on the NYCHRL hostile environment claim.

### C.    Discriminatory Failure to Promote

Moazzaz brings a discriminatory failure to promote claim under the NYSHRL and NYCHRL. The Court first addresses the state law claim. As with her hostile work environment claim, Moazzaz's pre-amendment NYSHRL claim is governed by the Title VII framework. To establish a *prima facie* case of discriminatory failure to promote, a plaintiff must demonstrate: (1) that she is a member of a protected class; (2) that she applied for a promotion to a position for which she was qualified; (3) that she was rejected for the position; and (4) that after this rejection, the position was filled by someone outside the protected class who was similarly or less well qualified than the plaintiff, or the employer kept the position open and continued to seek applicants. *Gordon v. City of New York*, No. 14-CV-6115, 2015 WL 3473500, at *7 (S.D.N.Y. June 2, 2015) (citing *Yu v. N.Y.C. Hous. Dev. Corp.*, 494 F. App'x 122, 124-5 & n.4

(2d Cir. 2012) (summary order)).  Once a plaintiff establishes a *prima facie* case, the burden

shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the

employee's rejection." *Yu*, 494 F.App'x at 125 (quoting *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 802 (1973)).  If the employer satisfied this burden, the plaintiff must show that the

reasons presented were a "pretext for discrimination." *Yu*, 494 F. App'x at 125 (citation

omitted).

Moazzaz was denied a promotion in 2017 to the EVP level, even though both her

predecessor and successor as Head of Global Real Estate at MetLife were EVPs.  The facts

underlying Moazzaz's promotion claim are substantially the same as those related to her

disparate pay claim—namely, the workings of MetLife's GGS, the potential for individual HR

employees to influence the output of the system, evidence of Hediger's potential gender bias, and

the relative grading of Moazzaz and her male comparators.  For substantially the same reasons

discussed in relation to the disparate pay claims, the Court concludes that Moazzaz has

established a *prima facie* case under the NYSHRL and has created triable issues of fact related to

MetLife's asserted affirmative defense and the question of pretext.  Accordingly, Moazzaz's

NYSHRL promotion claim survives summary judgment.  Because the NYCHRL claim is

evaluated under a more liberal standard than the state standard, Moazzaz's city claim also

survives summary judgment for the same reasons and *a fortiorari*.

### D.     **Discriminatory Termination**

Moazzaz also brings a discriminatory termination claim under the NYSHRL and

NYCHRL.  Once again, the Title VII burden-shifting framework applies to Moazzaz's state law

claim.  Assuming *arguendo* that Moazzaz has satisfied the "minimal requirements" of

establishing her *prima facie* case, *see St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993),

the Court considers whether MetLife has articulated "a legitimate, nondiscriminatory reason for

the termination, supported by admissible evidence which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) (first quoting *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311 (1996), and then quoting *Hicks*, 509 U.S. at 507) (internal citations and quotation marks omitted).

MetLife contends that Moazzaz's termination resulted from a job elimination as part of a corporate realignment, and that each of the relevant decisions was made for legitimate, nondiscriminatory reasons. The record shows that James O'Donnell, who became interim Head of GTO after Lippert's departure, made the decision to eliminate Moazzaz's job. (Defs.' SOF ¶¶ 57-58.) O'Donnell, who had previously been CIO, already had a Chief of Staff and determined he did not need someone at Moazzaz's level in that role. (*Id*. ¶ 64.) Furthermore, several of the areas that Moazzaz had overseen while Lippert was Head of GTO had already been transferred out of GTO. (*Id*. ¶¶ 59-61.) Moazzaz has testified that she did not believe O'Donnell discriminated against her based on her gender. (ECF No. 95 Ex. 6. at 222.) Rather, Moazzaz alleges discrimination because MetLife retained Kandarian's Chief of Staff, Michael Zarcone, after Kandarian's departure and assigned him the Real Estate portfolio, which had previously been overseen by Moazzaz. MetLife has offered evidence, however, that changes in MetLife's business strategy and Zarcone's relevant experience were legitimate, business-related reasons, unrelated to gender, for the reassignment of Real Estate. (Defs.' SOF ¶¶ 59-60.) After Moazzaz's termination, MetLife did not fill her former position as CAO for GTO because that job no longer existed. (*Id*. ¶ 65.) Based on the record evidence, the Court determines that MetLife has met its burden of asserting an affirmative defense.

Given MetLife's articulation of legitimate, nondiscriminatory reasons for the termination, the Court now addresses whether Moazzaz has shown a genuine factual dispute that is material to whether MetLife's stated reasons were pretextual.  She has not.  Moazzaz argues that her job was not, in fact, eliminated but rather that her duties were transferred to several different male employees.  She also argues that Lippert's departure did not necessitate her termination, as Kandarian's male Chief of Staff, Zarcone, was retained even after Khalaf became CEO and brought on his own Chief of Staff.  These arguments are insufficient to give rise to a genuine dispute over a material fact.

First, Moazzaz does not genuinely dispute the facts related to the corporate realignment that led to her termination—she merely disputes their characterization.  And whether one calls what happened a job elimination or a transfer of duties, Moazzaz has failed to adduce any evidence that her termination was pretextual.  The facts here are readily distinguishable from those in *Montana v. First Federal Savings and Loan Association of Rochester*, 869 F.2d 100 (2d Cir. 1994), the case Moazzez cites for the proposition that pretext can be demonstrated by evidence that a terminated employee's duties were transferred to people outside the protected class.  In *Montana*, the Second Circuit considered six different factors related to an employee's discharge pursuant to a corporate restructuring plan before concluding that a genuine factual dispute existed over the question of pretext.  869 F.2d at 105-06.  These factors included some highly suspicious circumstances that raised obvious signs of pretext.  In *Montana*, after the bulk of the plaintiff's duties were reassigned to a coworker outside the protected class, that coworker became overburdened and the company subsequently redistributed many of those duties to a newly hired employee.  *Id.* at 105.  The employer in *Montana* also actually increased the number of employees in the plaintiff's department after her discharge, which was purportedly part of a

downsizing plan.  *Id*.  In contrast, Moazzaz has not offered any evidence suggesting that MetLife's articulated reasons—the transfer of Real Estate for strategic reasons; Zarcone's relevant experience; O'Donnell's preference for his existing Chief of Staff; and O'Donnell's justifications for eliminating Moazzaz's role—were pretexts for discrimination.

Second, Moazzaz's contention that Lippert's departure did not require her termination is irrelevant in the absence of any evidence of pretext.  The redistribution of roles and responsibilities is common after corporate leadership changes, and Moazzaz has failed to raise any genuine factual disputes as to whether this corporate reorganization was a cover for discrimination.  Based on the record evidence, the Court determines that no rational jury could find that MetLife's offered justification was pretext.  In contrast, it would not be difficult for a rational jury to infer that after Lippert's departure, Moazzaz no longer had an internal champion at MetLife and that her role became expendable in the ensuing corporate reorganization for non-discriminatory reasons.  Accordingly, the Court concludes that Moazzaz has failed to raise a triable issue of pretext.  The award of summary judgment, therefore, in favor of MetLife on the NYSHRL termination claim is warranted.

The Court now turns to Moazzaz's discriminatory termination claim under the NYCHRL.  The NYCHRL makes it "an unlawful discriminatory practice . . . for an employer or employee or agent thereof, because of the actual or perceived . . . gender . . . of any person . . . to discriminate against such person in . . . terms, conditions, or privileges of employment."  NYCHRL § 8-107(1)(a).  The standard for a discriminatory act under the NYCHRL is more lenient than under Title VII or the pre-amendment NYSHRL.  "To prevail on liability, the plaintiff need only show differential treatment—that she is treated 'less well'—because of a discriminatory intent."  *Mihalik*, 715 F.3d at 110.   In other words, it is sufficient to show "differential treatment of any

degree based on a discriminatory motive." *Gokhovsky v. N.Y.C. Hous. Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014) (summary order).

Even under the NYCHRL's lower standard, Moazzaz's termination claim fails.  As discussed above, Moazzaz has failed to present evidence from which a reasonable jury could determine that she was terminated based on discriminatory intent.  Specifically, the record does not support the inference that MetLife's "stated reasons were not its sole basis for taking action, and that its conduct was based at least in part on discrimination." *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 77 (2d Cir. 2015) (internal citations and quotation marks omitted). Because the record establishes as a matter of law that discrimination played no role in Moazzaz's termination, summary judgment on the NYCHRL claim in favor of MetLife is appropriate.

### E.      Individual Liability

Moazzaz brings claims for individual liability against Kandarian, Khalaf, and Podlogar under the EPA and New York Labor Law § 194(1), and against all individual defendants under the NYSHRL and NYCHRL.

The Court first addresses Moazzaz's EPA and New York Labor Law claims against Kandarian, Khalaf, and Podlogar.  Under the EPA and its state analogue, an individual can bear liability as an "employer" based on whether the individual "possess[es] control over a company's actual 'operations' in a manner that relates to a plaintiff's employment," such as by determining "workplace conditions and operations, personnel, or compensation." *Irizarry v. Catsimatidis*, 722 F.3d 99, 109 (2d Cir. 2013); *Bonner v. Guccione*, No. 94-CV-7735, 1997 WL 362311, at *13 (S.D.N.Y. July 1, 1997) (concluding that individual liability exists for Equal Pay Act violations); *see also* 29 U.S.C. § 203(d).  The Second Circuit has held that "[n]othing . . . requires an individual to have been personally complicit in [the] violations; the broad remedial purposes behind the statute counsel against such a requirement." *Irizarry*, 772 F.3d at 110.  Based upon

the authority over the management, supervision, and oversight of Moazzaz's work that was held

by Khalaf and Kandarian in their role as MetLife CEO, the Court determines that they at least

potentially exercised operational control over Moazzaz's employment and therefore may qualify

as "employers" for the purposes of the claims.  Based on the record evidence related to

Podlogar's control over personnel and compensation in her role as Chief Human Resources

Officer, the Court also concludes that Moazzaz has also raised genuine factual issues related to

whether Podlogar exercised operational control over Moazzaz's employment.  Accordingly, the

Court denies summary judgment on the individual liability of Khalaf, Kandarian, and Podlogar

for Moazzaz's EPA and New York Labor Law claims.

The Court now turns to the liability of all five individual defendants based upon the

surviving NYSHRL and NYCHRL claims for disparate pay and discriminatory failure to

promote.  Because the Court is granting summary judgment in favor of MetLife on the state and

city hostile work environment and termination claims, the individual defendants are also entitled

to summary judgment on those claims.

Individuals may be held liable under both the NYSHRL and NYCHRL, but the test for

individual liability differs between state and city law.  *Chen v. Shanghai Café Deluxe, Inc.*, No.

17-CV-2536, 2023 WL 2625791 at *4 (S.D.N.Y. Mar. 24, 2023).  Under the NYSHRL,

individual liability may be imposed if "(1) a defendant has an ownership interest in the employer

or, alternatively, has the authority to hire or terminate its employees; or (2) if a defendant aided

and abetted the unlawful discriminatory acts of others."  *Id.*  An individual, however, must

"actually participate in the conduct giving rise to the plaintiff's discrimination . . . claim."

*Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 366 (S.D.N.Y. 2012) (cleaned

up).  "The NYCHRL provides a broader basis for direct individual liability than the NYSHRL."

*Id*.  However, even though "the NYCHRL provides for individual liability of an employee regardless of ownership or decisionmaking power," a plaintiff must still show that the individual actually participated in the discriminatory conduct.  *Id*. (internal citation and quotation marks omitted).  State and city claims for aider and abettor liability are evaluated under the same standard.  *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 344 (S.D.N.Y. 2009).  Under both laws, liability must be found as to the employer before an individual can be liable for aiding and abetting discriminatory conduct.  *Id*.

Because the NYSHRL and NYCHRL require actual participation in discriminatory conduct, unlike the EPA or New York Labor Law § 194(1), the Court reaches different conclusions on the question of individual liability under the state and city statutes.  Moazzaz has not presented evidence that would allow a jury to find that Khalaf, who became CEO on May 1, 2019 and was previously MetLife's Head of Europe, the Middle East, and Africa, actually participated in the conduct giving rise to Moazzaz's disparate pay and promotion claims, which primarily occurred in 2017 and 2018.  Moazzaz has likewise not presented evidence that would support a finding that Hijkoop, who retired from MetLife at the end of 2016, actually participated in discriminatory conduct within the three-year limitations period.  Accordingly, Khalaf and Hijkoop are entitled to summary judgment on the NYSHRL and NYCHRL claims.

The evidence also does not support individual liability for Kandarian.  The record shows that during the time period when Lippert was advocating for Moazzaz's promotion to EVP, Lippert informed Kandarian that her promotion was being held up by HR because of an investigation that Lippert believed was not meritorious.  (ECF No. 114 Ex. G at 115-16.)  Lippert did not, however, tell Kandarian at the time that the complaint was based on perceptions of Moazzaz being "mean" and "not being nice," nor did Lippert voice concerns that the failure to

promote Moazzaz was discriminatory.  Kandarian responded by advising Lippert to defer to HR on HR issues.  (*Id.* at 116-17.)  Later, in 2018, Lippert did inform Kandarian that Moazzaz believed she had the legal basis for a lawsuit against the company.  (*Id*. at 192.)  Kandarian responded by telling Lippert to make sure HR was aware of the situation and to ensure that HR was comfortable with its ability to defend against the potential suit.  (*Id*.)  Based on this record, the Court determines that the evidence of Kandarian's high-level deference to HR does not support an inference that Kandarian actually participated in discriminatory conduct.  Nor does the evidence support potential aiding and abetting liability.  "Aiding and abetting liability requires that the aider and abettor share the intent or purpose of the principal actor, and there can be no partnership in an act where there is no community of purpose."  *Tate v. Rocketball, Ltd.*, 45 F. Supp. 3d 268, 273 (E.D.N.Y. 2014).  Such is the case here.  Moazzaz has not presented evidence that would permit a rational jury to conclude that Kandarian was motivated by a discriminatory intent or purpose.  Accordingly, Kandarian is also entitled to summary judgment for the NYSHRL and NYCHRL claims.

The Court finally turns to the claims of individual liability against Podlogar and Hediger. For substantially the same reasons discussed in relation to the EPA and New York Labor Law claims against MetLife, including Podlogar's direct involvement in the review of Moazzaz's job grading, the Court determines that Moazzaz has presented sufficient evidence to support the inference that Podlogar actually participated in the discriminatory conduct giving rise to Moazzaz's disparate pay and promotion claims.  Likewise, the record evidence would permit a rational jury to conclude that Hediger, in his role as Moazzaz's HR Business Partner, also actually participated in the discriminatory conduct through his involvement in the GGS process.

Accordingly, the Court denies Podlogar and Hediger's motions for summary judgment on these NYSHRL and NYCHRL claims.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Specifically, MetLife's motion for summary judgment is granted as to the claims for hostile work environment and discriminatory termination under the NYSHRL and NYCHRL. MetLife's motion is denied in all other respects. The individual Defendants' motions for summary judgment are granted as to the hostile work environment and discriminatory termination claims under the NYSHRL and NYCHRL. The motions for summary judgment of Kandarian, Khalaf, and Podlogar are denied as to the EPA and New York Labor Law claims. The motions for summary judgment of Hijkoop, Kandarian, and Khalaf are granted as to the disparate pay and failure to promote claims under the NYSHRL and NYCHRL. The motions for summary judgment of Hediger and Podlogar are denied as to the disparate pay and failure to promote claims under the NYSHRL and NYCHRL.

The Clerk of Court is directed to close the motion at ECF Number 92.

SO ORDERED.

Dated:  March 26, 2024
         New York, New York

J. PAUL OETKEN
United States District Judge